[Crim. No. 13873.   Second Dist., Div. Five.   Apr. 10, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. HAROLD BRYAN JOHNSON, Defendant and Appellant.

618

Edward L. Lascher, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Arthur B. Rosenfeld, Deputy Attorney General, for Plaintiff and Respondent.

AISO, J.—Defendant Harold Bryan Johnson was charged in count I, of a two-count information, with a violation of section 459 of the Penal Code (burglary) and in count II with a violation of section 12021 of the Penal Code (possession of firearm concealable on the person by convicted felon). He was charged further with four prior felony convictions. After his motion under section 995 of the Penal Code was denied, he pleaded not guilty to the two charges and denied the prior felony convictions. A jury found him guilty on both counts, and fixed the burglary at first degree. He waived jury trial as to the prior felony convictions; the court found all four prior felony convictions to be true. Motion for new trial and request for probation were denied. Defendant was sentenced to the state prison on both counts. The sentence on count II was stayed in compliance with the *Niles* formula (*People* v. *Niles* (1964) 227 Cal.App.2d 749, 755-756 [39 Cal. Rptr. 11], approved *In re Wright* (1967) 65 Cal.2d 650, 655-666, fn. 4 [56 Cal.Rptr. 110, 422 P.2d 998]).

Defendant appeals from the judgment and sentence (Pen. Code, § 1237) and from the order denying his motion for new trial. Appeal from the order denying the motion for new trial is dismissed. (*People* v. *Garcia* (1967) 67 Cal.2d 830, 832, fn. 1 [64 Cal.Rptr. 110, 434 P.2d 366].)

Defendant contends: (1) the court committed prejudicial error in permitting him to act as his own counsel in propria persona for some of the pretrial proceedings and in thereafter compelling him to accept counsel for the trial; (2) the court erred in giving a jury instruction on a defendant's right to remain silent and not to take the witness stand; (3) the court erred in giving an instruction on flight; and (4) the physical evidence introduced should have been suppressed as being the product of an illegal arrest.

We have concluded that none of the contentions have merit despite the ingenuity with which they have been presented. The judgment and sentence, therefore, should be affirmed.

We shall consider the assignments of error in reverse order from that used by the defendant.

## I.

Only the facts relevant to assignments (3) and (4) are detailed here. Matters pertinent to assignments (1) and (2) will be set forth when we discuss those points.

On January 11, 1967, Mrs. Sue Sumiko Hutchins resided at 1847 West 41st Street, Los Angeles. She left her home for work at 8:30 a.m. Everything in her home was in good order; nothing was missing.

She received a call that someone had broken into her house; she returned about 3:30 p.m. She noticed that her back bedroom window, which was closed when she left at 8:30 a.m., was open. She found jewelry and coins missing from her jewelry box. She identified a watch, a ring, a "Kennedy half dollar and two Las Vegas coins" as being the missing items. (These were items recovered by the police from the defendant who tossed them to the ground at the time of his apprehension [Exhibit 1].)

She had not given the defendant nor anyone else permission to enter her home in her absence or to take any of the items in question. She had never seen the defendant prior to January 11, 1967.

A Reverend Bertha Tinsley resided across the street. Her home was one house to the west of the one directly opposite Mrs. Hutchins' house. Looking out her front window around

1 p.m. on January 11, 1967, she saw the defendant in front of her house. Then she observed that defendant crossed the street, went to a "green" house about two houses west of Mrs. Hutchins' place, and rang the doorbell. He was carrying a small black folder. After standing on the porch of the "green" house for "a period of time," defendant "went down to 1847." He rang the doorbell at 1847, stood for about five minutes, walked off the porch and went around the side to the back. When he did not reappear for a period of time, she phoned the police because people just "don't go to the back." She next saw the defendant being put in the police car.

Mrs. Verna Mae Tress resided at 1835 West 41st Street on the day in question. Her residence was on the same side of the street and was the third house to the east of 1847. She first had seen the defendant walking westerly past her house about 8 or 8:30 a.m. that day.

At approximately 1 p.m., she was watering her lawn in front of her house. She saw the following: Defendant went to 1847 and rang the doorbell. No one answered. Defendant stood there about ten minutes. He was carrying a small black case.

Then Mrs. Tress saw a police car turn the corner, drive close to the curb on her side and stop in front of 1847. At that time, defendant was no longer on the porch. The policeman went to the door and rang the doorbell. Then she saw defendant come out of the house. There was some conversation and then defendant went back inside the house. Then she heard a commotion to the rear of her house and saw another policeman coming from the alley and jumping into her next door neighbor's yard. She ran along the driveway to the rear. She wanted to tell the officer that defendant was in Mrs. Hutchins' house. She saw that the "policemen had Mr. Johnson."

James K. Allen was a plainclothes officer assigned to the Wilshire Division detectives on the day in question. He and his partner, Officer Borck, went to 1847 West 41st Street, Los Angeles, in an unmarked police vehicle in response to a call that a burglary was possibly in progress at that location. He arrived about 2:15 p.m.

He approached the house while his partner drove the car toward the alley which runs along the back of the premises. He noticed no one in view, that is, no one was on the street and no one was in front of the house. As he started to walk

along the driveway extending to the rear along the westerly side of the premises, he heard the front door open when he was about five steps beyond the front of the house. He returned to the front of the house and there observed defendant emerging from the house onto the front porch. "[Defendant] was carrying something in his left hand. His right hand was inside his coat . . . in the area of his left waistband."

"[Officer Allen] asked him if he had called the police and he said that he had not. He told me that he had seen some- one . . . running from the location at this house. And as he was saying this he was backing slowly toward the front door of the house." "[Officer Allen] said, 'Oh, then you must live here?'" Defendant "replied to the effect that he did live there and backed into the door and quickly closed the front door." The impact of defendant's conduct upon Officer Allen caused him to go to the corner of the driveway and the house where he "hollered" his partner officer's name, say- ing, "Pete, he is coming out the back." Officer Allen pro- ceeded to the back area and observed defendant in the rear yard of 1843 West 41st Street, one house east of 1847. He identified the defendant as the person who had come out of the front door of 1847. It took Officer Allen about 20 seconds to get from the front of the house to the rear.

Officer Arthur L. Ramirez of the Los Angeles Police Department, one of the arresting officers, testified that he arrested defendant around 2:20 p.m. on January 11, 1967. He and his partner officer, Sergeant Cleghorn, received a radio call that there was a burglary suspect at 1847 West 41st Street. They drove to the location through an alley to the rear of the place, arriving about 2:15 p.m. Officer Ramirez observed another police car coming along the same alley westbound.

He stopped at what he thought was the rear of 1847. As he did so, Sergeant Cleghorn "got out" and Ramirez followed. He heard his partner shout, "police officer, halt" and saw defendant at that moment in the rear yard of 1843 West 41st Street, coming from the direction of a 3-foot-high fence. It had no gate and extended between 1843 and 1847. Defendant was coming from the direction of 1847, and was carrying a black bag or package in his left hand. When Sergeant Cleg- horn identified himself as a police officer defendant dropped the package to the ground. Ramirez and his partner ap- proached defendant, and when Sergeant Cleghorn again told

defendant to put up his hands, defendant threw what appeared to be jewelry or coins from his right hand. Ramirez gave the defendant a cursory search and then picked up the package which defendant had thrown from his left hand and ascertained that inside there was a .38 caliber revolver, 2 inches long, fully loaded. He next picked up the items of jewelry and coins (Exhibit 1), identified at trial by Mrs. Hutchins as having been taken from her jewelry box. He noted that a window in the right rear side of the Hutchins' residence was open.

James D. Steele, an officer assigned to the University Detective Division, went to 1847 W. 41st Street on January 11, 1967. He also went there in response to a burglary call. He arrived shortly after 2 p.m., and saw defendant at the rear of 1843 West 41st Street in custody of the other officers. He searched defendant and recovered a screwdriver from the defendant's left rear pocket and a notebook and twine from an inside coat pocket. (Exhibit 8.) He also observed a window open in the rear bedroom of 1847 West 41st Street.

The defense offered no evidence before the jury. Defendant had testified out of the jury's presence in the hearing on his motion to suppress the physical evidence recovered at the time of his arrest upon the ground that the arrest was illegal. He testified that at the time the officers told him to halt, he did not have anything in his hands.

## II.

The physical evidence recovered at the time of defendant's arrest was legally obtained. The court, therefore, did not err in denying defendant's motion to suppress.

Officers Ramirez and Cleghorn went to the rear of 1843 and 1847 West 41st Street responding to an official call that a burglary was possibly in progress. Arriving at the location, they spotted defendant walking away from a fence, 3 feet high and with no gate, which ran between 1847 and 1843 West 41st Street. Defendant had a black bag or container in his hand and was coming from the direction of 1847. The officers were entitled to make a *Mickelson* type of stop to interrogate him. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906, 88 S.Ct. 1868]; *People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Ruiz* (1968) 263 Cal.App.2d 216, 220 [69 Cal. Rptr. 473].) At that juncture, defendant dropped the black bag from his left hand. As the officers approached him, he

threw what appeared to be jewelry and coins from his right hand. At this point there was reasonable and probable cause to arrest the defendant. (*People* v. *Ross* (1967) 67 Cal.2d 64, 70 [60 Cal.Rptr. 254, 429 P.2d 606], reversed on other grounds 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850].) Further search of the black bag disclosing the .38 caliber revolver, and of defendant's person revealing the screwdriver and twine, constituted a search incident to a lawful arrest. Hence it was legal. (See, e.g., *United States* v. *Rabinowitz* (1950) 339 U.S. 56, 60-61 [94 L.Ed. 653, 657-658, 70 S.Ct. 430]; *Harris* v. *United States* (1947) 331 U.S. 145, 151-153 [91 L.Ed. 1399, 1406-1407, 67 S.Ct. 1098]; *People* v. *Winston* (1956) 46 Cal.2d 151, 162 [293 P.2d 40].)

### III.

Defendant complains that the instruction on flight (CALJIC 36 [Rev.]) was improper. It read: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

The instruction was proper. (Pen. Code, § 1127b; *People* v. *Hill* (1967) 67 Cal.2d 105, 120 [60 Cal.Rptr. 234, 429 P.2d 586].) Defendant's backing into the house when confronted by Officer Allen at the front door (causing Officer Allen to yell to his partner, Pete, that the culprit was coming out the back door), his exit through the rear of the house, his hurdling or jumping the fence between 1847 and 1843 West 41st Street, and his walking away from an adjoining yard—all within a matter of seconds or at the most within a minute or two—could be interpreted by a trier of fact to be a flight. When such a deduction is rationally possible from the evidence, an instruction on the effect of flight is proper. (*People* v. *Hinshaw* (1924) 194 Cal. 1, 26-27 [227 P. 156]; *People* v. *Kessler* (1968) 257 Cal.App.2d 812, 814-815 [65 Cal.Rptr. 248].)

If the flight be construed to be an admission by conduct as the defendant contends, it was not necessary for the court to give *sua sponte* a cautionary instruction that testimony pertaining thereto should be viewed with caution. The cautionary instruction as to admissions pertained to oral

admissions. The reason for the rule was that oral statements not recorded or reduced to writing can be easily twisted or misunderstood. (*People* v. *Gardner* (1961) 195 Cal.App.2d 829, 832 [16 Cal.Rptr. 256].) Such is not true as to conduct. "When the reason of a rule ceases, so should the rule itself." (Civ. Code, § 3510.)

IV.

■ CALJIC 51 (1965 Rev.) on a defendant's right not to testify read: "It is a constitutional right of a defendant in a criminal trial that he may not be compelled to testify. Thus the decision as to whether he should testify is left to the defendant, acting with the advice and assistance of his attorney. You must not draw any inference of guilt from the fact that he does not testify, nor should this fact be discussed by you or enter into your deliberations in any way."

Although the history noted on the instruction states that it was requested by the People and given as requested, the reporter's transcript discloses that it was given at the request of defense counsel as well; at least, the defendant and his counsel affirmatively acquiesced in its being given.

The court advised the defendant that the instruction had been requested and then stated: "I want you to tell me whether or not you want me to give this instruction or not after you have had a chance to discuss the matter with your attorney." The court then read the instruction to the defendant. After another witness had been examined, the court returned to the question whether defendant desired the instruction to be given:

"THE COURT: . . . I would like a decision from you as to whether or not you want me to give that instruction to the jury. Is it your desire that that instruction be given to the jury?

"DEFENDANT JOHNSON: Your Honor, I have left that entirely to the discretion of my counsel and he has advised me that it is an appropriate instruction.

"THE COURT: He has also indicated to the Court that *he desires that the instruction be given.* Is it your desire to follow his advice? [Italics added.]

"DEFENDANT JOHNSON: I understand that. What I am saying is that I have asked him and he has advised me that it is a proper instruction. So I have left it to his discretion to advise the Court as to whether it would be acceptable for the defendant.

"THE COURT: Mr. Latiner [defense counsel], it is your

desire that this instruction be given on behalf of the defendant?

"MR. LATINER: Yes, your Honor."

If the instruction, or the giving thereof, be assumed arguendo to have been erroneous, it was an invited error of which defendant may not complain. "[I]t is well settled that an appellant cannot question or complain of instructions given at his own request." (*People* v. *Curtis* (1939) 36 Cal.App.2d 306, 321 [98 P.2d 228]; see *People* v. *Woods* (1950) 35 Cal. 2d 504, 510 [218 P.2d 981].)

## V.

Defendant presents another facet of the problem which plagues the trial courts, namely, the competing constitutional doctrines (Cal. Const., art. I, § 13) of the right to counsel (*In re Fresquez* (1967) 67 Cal.2d 626, 629 [63 Cal. Rptr. 271, 432 P.2d 959]) and of the right to defend oneself as one's own advocate in propria persona. (*People* v. *Maddox* (1967) 67 Cal.2d 647, 651 [63 Cal.Rptr. 371, 433 P.2d 163].) Defendant contends that having been permitted to proceed in propria persona for some of the proceedings, but having been compelled to be represented by a public defender at the trial, the court erred in one instance or the other.

We have read the supplemental clerk's transcript containing the reporter's transcript of the preliminary hearing and the two supplemental reporter's transcripts in which the proceedings relevant to this contention were reported. Having done so, we reach the following appraisal of the situation: defendant was not competent to try the case before a jury. However, he felt that he was capable of and was desirous of arguing motions (e.g., Pen. Code, § 995) and petitioning the appellate courts for review. He needed consultation with the public defender, but felt that accepting the public defender as his counsel would terminate his "pro. per. library privileges," which he did not want to lose. Once Judge Hayden made it clear that defendant's pro. per. library privileges were not being revoked despite Deputy Public Defender Latiner's appointment to defend him, he was completely satisfied to have Mr. Latiner try the case to the jury.

Defendant was represented by a public defender at the preliminary hearing. When the hearing terminated on January 25, 1967, defendant immediately asked the magistrate that he be substituted in propria persona in lieu of the public

defender. As soon as the magistrate acquiesced, defendant asked for "regular visitation privileges to the law library at the County Jail Library."

On February 8, 1967, at the time scheduled for his arraignment in the master calendar department of the superior court (Department 100), defendant made known his desire to proceed in propria persona without counsel. He represented to Judge Feinerman that he had had two years of schooling at the University of California, Berkeley; that he had studied law off and on for over 12 years in prison and in the courts; that although he had never tried a case to a jury, he had made motions under 995 and prosecuted appeals, including a couple of petitions for certiorari to the United States Supreme Court; that he was aware of the gravity of the offenses with which he was charged and of the consequences if he were to be convicted, but that he nevertheless desired to represent himself. Thereupon Judge Feinerman found that "the defendant is competent to represent himself for purposes of trial." Permitting the defendant to proceed in propria persona upon the foregoing representation was not error. One need not know as much law as a lawyer; the choice of waiving right to counsel was made with his eyes open and his being cognizant of the consequences. (*People* v. *Addison* (1967) 256 Cal.App.2d 18, 24-25 [63 Cal.Rptr. 626]; *People* v. *Ruiz* (1968) *supra*, 263 Cal.App.2d 216, 223-226.)

On March 2, 1967, defendant argued his 995 motion before Judge Smith. Upon its denial he pleaded "not guilty" to the two charges and denied the prior felony convictions. The basis of his 995 motion was the same as that presented by his motion to suppress the real evidence made at the trial. Hence, no prejudice resulted even if we assume arguendo that Judge Feinerman should not have let him proceed without counsel.

On April 4, 1967, when Judge Hayden called the case for trial, the defendant stated he was not ready for trial and asked for a month's continuance. This was denied. However, Judge Hayden granted defendant's *pro se* motion for discovery. Thereafter a colloquy, extending over 14 pages of the reporter's transcript, took place between defendant and Judge Hayden, which was climaxed by Judge Hayden finding that defendant had not intelligently waived his right to an attorney and that he was appointing the public defender to represent him. Thereafter, when Deputy Public Defender Latiner appeared, he stated that he wanted the record to show that he was being appointed despite defendant's feeling him-

self competent to represent himself, but adding, "I think what Mr. Johnson desires is to be accorded law library privileges." When the court explained that his library privileges were not being taken away despite Mr. Latiner's appointment, the defendant registered no further objection. Defendant indicated to Judge Hayden that he had talked to Mr. Latiner and found him "compatible." Upon defense counsel's request, the trial was continued to May 1, 1967.

In this case, the net result was that the defendant was permitted to eat the part of the cake he wanted to eat and have the part he desired to keep. Even if this were not so, the appointment of counsel for defendant to try the case to the jury was not error. It was, as reflected by the record, for the dual purpose of protecting defendant and of promoting the orderly administration of justice. If, subsequent to an original ruling that a defendant is competent to proceed in propria persona, later developments reveal that he is not as competent as originally appeared and that his waiver was not in fact an intelligent one, and that this situation is also tending to subvert the orderly and efficient administration of justice, a court, we think, has the duty to appoint counsel for such a defendant. (See *People* v. *Carter* (1967) 66 Cal.2d 666, 670, 672 [58 Cal.Rptr. 614, 427 P.2d 214]; *People* v. *Crovedi* (1966) 65 Cal.2d 199, 208 [53 Cal.Rptr. 284, 417 P.2d 868].)

The judgment and sentence is affirmed; the attempted appeal from the order denying motion for new trial is dismissed.

Stephens, Acting P. J., and Reppy, J., concurred.

A petition for a rehearing was denied April 29, 1969, and appellant's petition for a hearing by the Supreme Court was denied June 4, 1969.