[Crim. No. 13829. In Bank. Nov. 14, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES H. CARR, JR., Defendant and Appellant.

288

## COUNSEL

Marvin W. Friedman, under appointment by the Supreme Court, for Defendant and Appellant

Thomas C. Lynch, Attorney General, Edward A. Hinz, Jr., and Nelson P. Kempsky, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PETERS, J.**—A jury found Charles H. Carr, Jr., guilty of first degree murder and fixed the penalty at death. A motion for a new trial was denied, and this appeal is now before us automatically under subdivision (b) of Penal Code section 1239.

The decedent, Clay Von Hastings, was a 75-year-old widower who lived by himself in Oroville, California.

Several people testified that they had last seen the decedent alive on the night of February 21, when they were playing cards with him at the Liberty Club in Oroville. Decedent often played low ball poker at the Liberty Club, and on February 21 he was present from approximately noon until at least 11 p.m. He lost about $200 that day.

Decedent was known to have frequently carried between $400 and $1,100 in his wallet, and he took little care to hide the fact that he was carrying such large amounts on his person. On February 21, he was not careful when reaching into his wallet for money to purchase chips.

Decedent's body was discovered after his sister and brother-in-law became worried after receiving no answer to their phone calls on the 22d, 23d and 24th. They called Charles Conrad, an acquaintance of decedent, and he went to decedent's home and found the body. He called the police. Decedent's face was covered with a sheet. There was blood both on the walls and floor. The police thought that decedent may have taken his own life and checked for weapons. The dresser and desk drawers in the bedroom were open. The police also found a brochure for a GE portable radio that decedent owned, but no radio was found on the premises. A dresser in the bedroom contained a box of empty shells for a .300 Savage rifle, which decedent owned, but neither live cartridges nor the rifle was found. There was no money in decedent's wallet and only a small amount of change in his pockets.

The pathologist who performed the autopsy testified that decedent's death was caused by multiple fractures of the head with injuries to the brain. He estimated that the homicide occurred between 1 and 6 a.m. on the 22d of February. He concluded that while some of decedent's injuries were consistent with a fall from a great height, others were not and that the wounds were consistent with the theory that the injuries were caused by multiple blows from a blunt instrument such as a hammer.

The pathologist testified that the decedent could not move after his injuries, would have been instantly unconscious, would have died within a few minutes, and could not have pulled the sheet over his head. The pathologist also stated that the wounds were consistent with decedent's being on the floor when he was beaten.

A clinical bioanalysis showed that the decedent's blood was type AB, a relatively infrequent type found only in about 4 percent of the population.

Defendant had been living with his uncle, who testified that defendant had brought home a GE portable radio and wanted to sell it to him.

The defendant was seen with an unidentified man at the Liberty Club on February 21. They watched the play at the table, and defendant borrowed one dollar from a player.

Defendant offered to sell the GE radio and a rifle similar to the one owned by the decedent. During the week after decedent's death the defendant had played cards at the Liberty Club losing approximately $100 to $200.

On March 11, 1969, Sergeants Hall and McElhaney of the Oroville Police Department went to the rented residence of Lionel Tholmer, part of a duplex on Ithaca Street in Oroville where the defendant occasionally stayed. The duplex was owned by Vernon Corporon and his wife. The officers looked through the windows, did not see any clothing and only a few bits of furniture and thought the premises were abandoned. Officer Hall saw what seemed to be blood stains on a door which led under the house. He opened it, crawled under the house, and found one board which was much newer than the others. Upon lifting the board he discovered a hammer covered with blood and hair. The hammer belonged to defendant's uncle who could not recall when he had last seen it. There was expert testimony that the blood was AB human and that the hair was the same as a sample of the decedent's.

- Officer Hall testified that he had received prior consent from the owner of the building, although it was somewhat unclear as to which of the Cor-

porons consented. Prior consent was also indicated by Vernon Corporon's testimony.

Defendant was first questioned on March 12, 1969, by Lieutenant Spinale. At that time defendant was in the Butte jail for a traffic offense, and he denied knowledge of the homicide.

On March 16, Spinale again questioned defendant. Defendant agreed to talk to Spinale after he was given his constitutional warnings. At that time defendant declined to confess. Defendant then asked to see his parents, and Spinale brought him to his parents' home. Defendant was not handcuffed or otherwise visibly restrained. A conversation then took place between defendant, Spinale and defendant's family dealing with the homicide and other matters.

Defendant, his mother and his sister testified that Spinale promised that if defendant would confess he would see to it that defendant was charged with second degree murder as a maximum. Spinale denied having made any such promise. Two witnesses testified that in a case involving robbery, Spinale had offered a deal in exchange for a confession. Spinale denied having made such a deal. Defendant also claimed that he requested counsel, but that the requests were ignored. Spinale denied that defendant had requested counsel.

Defendant at first refused to discuss the homicide, claiming that if he talked he would expose himself to retaliation by an unidentified person. However, defendant finally admitted that he killed decedent although he did not specify any of the details.

After the admission, defendant claimed that he told Spinale that he wanted to think things over, but that Spinale said that if he did not confess immediately he would ask the district attorney to ask for the gas chamber. Spinale denied making any such statement.

Spinale then took defendant back to the station and again gave him the constitutional warnings. At one point he was shown the hammer. Defendant agreed to confess on video-tape, and after he did so, he signed a written confession.

In the taped confession, defendant said that he had asked to use the decedent's telephone. Upon entering the house he waited for the opportunity and hit the decedent over the head. Defendant stated that he only wanted to hit the decedent hard enough for the decedent to lose his memory of defendant's presence. He also indicated that he had been smoking marijuana. A friend of defendant's told him to stop hitting decedent. Defendant covered the decedent's head with a sheet so as not to have to look at the

body. He admitted taking decedent's wallet containing $741 and the radio and rifle. Defendant then went to his friend's house and divided the money. The friend said that he would get rid of the hammer.

Similar statements were contained in the written confession. In addition he stated that "If I had not had been smoking pot before it happened I probably don't think I could have gotten the guts to do it in the beginning, as I stated before I am very sorry for this to happen to my life."

On the next day Spinale went to the defendant's parents' home and obtained the radio. Defendant was shown the radio at the station and said he told his brother to get rid of it.

Although defendant testified in hearings on the admissibility of evidence, he did not take the stand on the general issue of guilt.

The judge instructed the jury that murder was the unlawful killing of a human being with malice aforethought and that "[a]ll murder which is perpetrated by means of any kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate robbery, is murder in the first degree, and all other kinds of murder are of the second degree." While the judge gave lengthy instructions on the definition of malice, he did not define premeditation-deliberation. He also instructed the jury that it could only find defendant guilty of murder in the first degree or acquit him.

Defendant requested that the jury be instructed as to second degree murder and voluntary manslaughter on the ground of diminished capacity.

■ Although instructions should be given on diminished capacity whenever there is evidence that the defendant was unable to form the requisite specific criminal intent (*People* v. *Conley,* 64 Cal.2d 310, 316-318 [49 Cal.Rptr. 815, 411 P.2d 911]), no such instructions need be given when there is no evidence from which a jury composed of reasonable men could have concluded that there was diminished capacity sufficient to negate the requisite criminal intent (*People* v. *Nichols,* 3 Cal.3d 150, 165 [89 Cal.Rptr. 721, 474 P.2d 673]; *People* v. *Fain,* 70 Cal.2d 588, 597-598 [75 Cal.Rptr. 633, 451 P.2d 65]; *People* v. *Miller,* 57 Cal.2d 821, 830-831 [22 Cal.Rptr. 465, 372 P.2d 297]). The instructions need not be given when the evidence of diminished capacity is minimal. (*People* v. *Harris,* 7 Cal.App.3d 922, 926 [87 Cal.Rptr. 46].)

It has been held that merely showing that the defendant consumed some alcohol prior to commission of the crime without showing the effect of the alcohol on him is not sufficient to warrant an instruction on diminished capacity. (*People* v. *Bandhauer,* 66 Cal.2d 524, 528 [58 Cal.Rptr. 332,

426 P.2d 900]; *People* v. *Spencer,* 60 Cal.2d 64, 87-89 [31 Cal.Rptr. 782, 383 P.2d 134]; *People* v. *Miller, supra,* 57 Cal.2d 821, 830-831.) Similar rules should apply to the consumption of marijuana.

In the instant case, there is no evidence as to the amount of marijuana smoked. The only evidence as to the effect on defendant of the marijuana is that it gave him courage to carry out his criminal design. Such evidence in no way negates his intent to commit his acts or his awareness of their wrongful nature. (Cf. *People* v. *Conley, supra,* 64 Cal.2d 310, 316 et seq.) Although evidence that marijuana gives a defendant courage to carry out his criminal design relates to his ability to premeditate and deliberate, we are satisfied that, in the absence of evidence indicating the quantity of marijuana consumed or additional evidence reflecting the state of defendant's mind, a jury could not reasonably have concluded, in the light of the evidence in this case, that defendant by reason of intoxication did not premeditate or adequately deliberate. Accordingly, the refusal of the offered instruction was not error.

Defendant contends that statements made by him were improperly admitted into evidence in violation of his constitutional rights. He claims that while he was advised of his rights under *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], he did not effectively waive those rights.

Spinale testified that he had advised defendant of his right to counsel, his right to the presence of counsel at questioning, his right to remain silent, his right to the appointment of counsel if indigent and that anything he said could be used against him prior to questioning on March 12 and March 16, 1969, before going to defendant's parents' home, at the police station both before and after the tape machine was turned on and prior to the written statement. On each occasion defendant was asked whether he understood his rights and was nevertheless willing to talk and he responded affirmatively. Defendant testified on his motion to suppress as follows: "Q. Now, Mr. Carr, there is no question that from the very first time that Officer Spinale questioned you, that he informed you of your Miranda rights, your right to remain silent, and the right to counsel before he ever questioned you; is that right? A. That is right. Q. And you understood what he told you? A. Yes, I did."

The only evidence offered by defendant that he was denied any of his *Miranda* rights was his testimony that after leaving his parents' home he asked for counsel and did not get it. This testimony was denied by Spinale, and obviously the trial judge accepted this denial.

Defendant next claims that his confessions were induced by a

promise by Spinale to the effect that if defendant confessed he would be tried for no crime higher than second degree murder.

 If the confession was elicited by promises of benefit or leniency the evidence was inadmissible. (*People* v. *Johnson,* 70 Cal.2d 469, 479 [74 Cal.Rptr. 889, 450 P.2d 265]; *People* v. *Brommel,* 56 Cal.2d 629 [15 Cal.Rptr. 909, 364 P.2d 845]; cf. *People* v. *Ditson,* 57 Cal.2d 415 [20 Cal.Rptr. 165, 369 P.2d 714].)

 At the trial the defendant, his mother, and his sister testified that Lieutenant Spinale had made such a promise. Defendant's father similarly testified at the pretrial hearing. Defendant testified that he had only confessed because of this inducement. Lieutenant Spinale at both the pretrial and trial hearings, denied having made any such promise. Defendant's own statements, contained in the video-taped confession, state that no such promise was made; defendant also affirmatively answered that he understood that first degree murder was involved and that he could get the death penalty. Moreover, defendant stated in this confession that he was confessing because "I figured it was for my better part—better— figured it was for my behalf."

As the testimony relating to promises by Lieutenant Spinale was contradicted by both Lieutenant Spinale and, in part, by defendant himself, we have accepted the findings of both judges ruling on this matter who obviously disbelieved the testimony that a promise had been made. (*People* v. *Burton,* 6 Cal.3d 375, 381-384 [99 Cal.Rptr. 1, 491 P.2d 793]; *People* v. *Randall,* 1 Cal.3d 948, 954 [83 Cal.Rptr. 658, 464 P.2d 114]; see Evid. Code, § 405.)

 Defendant contends that at least three tapes were made of interviews between defendant and Lieutenant Spinale at the police station on the evening of March 16, 1969, and that the trial judge should have reviewed those tapes before ruling on the issue of the voluntariness of defendant's confessions. It should be noted that defense counsel made no such request at the trial even though he was aware, at least at the time of the hearing on admissibility before the trial court, of the existence of the other tapes. We cannot hold that a trial judge should be responsible for the introduction of this evidence where defense counsel has knowledge of its existence. As counsel knew of the existence of these tapes his decision not to request their introduction for the trial court's consideration was most likely a matter of strategy or judgment. Therefore, we should not "attempt to second-guess trial counsel." (*People* v. *Brooks,* 64 Cal.2d 130, 140 [48 Cal.Rptr. 879, 410 P.2d 383].)

■ Defendant contends that toward the end of his taped interview with Lieutenant Spinale, the lieutenant asked him "Would you like to quit now, Mr. Carr?" To this the defendant nodded affirmatively. Spinale then asked a few more questions; specifically, he asked whether the defendant had anything to add to the interview, or on his own behalf, if he understood or had any doubt that he would be charged with first degree murder, whether he had been treated well or threatened, and whether he had been given cigarettes when he wanted them. The defendant's answers were basically confined to a "yes" or "no." While the issue of the admissibility of the confessions was made both at the pretrial hearing and at trial the defendant did not object to the admissibility of the· confession on the basis that he had reasserted a right to remain silent or had thereby requested counsel. If the defendant had indicated a desire to reassert his rights then any incriminating statement made by the defendant thereafter in response to further questioning would be inadmissible under *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]. (See *People* v. *Randall, supra,* 1 Cal.3d 948, 954-955.)

Here, the evidence that the defendant was reasserting his *Miranda* rights is highly equivocal. In fact, taking into account the circumstances surrounding the alleged request to discontinue questioning, Lieutenant Spinale was probably asking the defendant if he was ready to end the interview as the lieutenant felt that there was little else to talk about and that is how the defendant took the statement. In such a situation defense counsel should have objected to the admission of the confessions on *Fioritto* grounds; failing to do this the issue is not properly before this court. (*People* v. *Terry,* 2 Cal.3d 362, 383 [85 Cal.Rptr. 409, 466 P.2d 961]; see *People* v. *Doherty,* 67 Cal.2d 9, 14 [59 Cal.Rptr. 857, 429 P.2d 177].) The failure to object cannot be explained on the ground of ignorance as *Fioritto* was published approximately a full year prior to the trial of this case.

■ Defendant contends that the trial court erred in admitting into evidence the product of an asserted illegal search and seizure, the alleged murder weapon found beneath the duplex on Ithaca Street. A pretrial motion to suppress the introduction of the hammer into evidence was heard by the court pursuant to Penal Code section 1538.5. The motion was denied, and no review was sought. The entire issue was again raised at trial and a new hearing de novo was held before the trial judge. The motion was again denied.

At the trial, Officer George Hall of the Butte County Sheriff's Department testified that on March 7, 1969, he received permission to conduct a search from Mrs. Vernon Corporon, who, with her husband, was the

owner of the duplex in question. Hall also testified that on the morning of the search, but prior to it, he had talked with Vernon Corporon and had also received his permission. Hall further stated that when he and Sergeant McElhaney arrived at the duplex no tenants were present and that the duplex appeared unoccupied. Hall stated that he knocked on the doors and looked through the windows and saw no sign of occupation, the curtains being open and only a table, chairs and a refrigerator in one apartment and a couch in the other being visible. Hall then testified that he opened a gate-type door leading under the house, entered a crawl-space, found a board which looked newer than others piled inside, lifted the board and found the hammer in question. The trial court ruled that the search was valid due to the prior consents of the owners. There was no contradictory evidence that the duplex was anything other than unoccupied.

■ A search is not unreasonable when made with the consent of a third party whom the police reasonably and in good faith believe to have authority to so consent. (*People* v. *Hill,* 69 Cal.2d 550, 554-555 [72 Cal. Rptr. 641, 446 P.2d 521], cert. granted 396 U.S. 818 [24 L.Ed.2d 68, 90 S.Ct. 112], affd. 401 U.S. 797 [28 L.Ed.2d 484, 91 S.Ct. 1106]; *(People* v. *Superior Court (York)* 3 Cal.App.3d 648, 654 [83 Cal.Rptr. 732]; *People* v. *Urfer,* 274 Cal.App.2d 307, 310 [79 Cal.Rptr. 60]; see *People* v. *Van Eyk,* 56 Cal.2d 471, 478 [15 Cal.Rptr. 150, 364 P.2d 326]; *People* v. *Caritativo,* 46 Cal.2d 68, 72-73 [292 P.2d 513]; *People* v. *Gorg,* 45 Cal.2d 776, 783 [291 P.2d 469]; cf. *Martin* v. *Cassidy,* 149 Cal. App.2d 106, 110-111 [307 P.2d 981].)

■ Here the Corporons were the owners of the premises thus giving them the right to consent if no other persons were legitimately in occupation of the property. The police could reasonably have assumed from all of the facts that the premises were not occupied and thus the trial court's conclusion that the search was legal cannot be disturbed.

The evidence was also sufficient for the court at the pretrial suppression hearing to find that sufficient consent for the search existed. At the suppression hearing there was evidence that a neighbor stated that no one was living in the duplex, the rent was unpaid, that on a previous visit by the police there had been no signs of occupation, and that the Corporons accompanied a lady who wanted to remove her clothing from one of the apartments and helped remove a few odd bits of clothing and a sawed-off shotgun from Mr. Tholmers' apartment. There was some conflict as to the time of the permission to search, but Mr. Corporon testified that he had consented prior to the search. The trial judge had substantial evidence to find that the consent was given prior to the search and thus the judge's decision must be upheld. (*People* v. *Anthony,* 7 Cal.App.3d 751, 762

[86 Cal.Rptr. 767]; *People* v. *Wilcox,* 276 Cal.App.2d 414, 417 [81 Cal. Rptr. 60]; *People* v. *Baker,* 267 Cal.App.2d 916, 920 [73 Cal.Rptr. 455].)

■ Defendant contends that the trial court erred by denying defendant's motion to discharge his court-appointed counsel. This motion was made by the defendant on the first day of trial, after the venire had been called, but before the roll call of the prospective jury. The defendant requested new counsel in chambers. The trial court asked the defendant for his reasons in making this motion and the defendant stated that he felt his counsel was incompetent, and had failed to cooperate with the defendant. The court asked him "in what way has there been any lack of cooperation?" and defendant responded that the trial counsel had failed to make an argument requested by the defendant at his section 1538.5 suppression hearing. He failed to give any other reason. The trial court denied the motion. Defendant points to *People* v. *Marsden,* 2 Cal.3d 118 [84 Cal. Rptr. 156, 465 P.2d 44], to support his contention.

We have held that the right to the discharge or substitution of court-appointed counsel is not absolute, and is a matter of judicial discretion unless there is a sufficient showing that the defendant's right to the assistance of counsel would be substantially impaired if his request was denied. (*People* v. *Marsden, supra,* 2 Cal.3d 118, 123; *People* v. *Williams,* 2 Cal. 3d 894, 904 [88 Cal.Rptr. 208, 471 P.2d 1008]; *People* v. *Johnson,* 271 Cal.App.2d 616, 625-627 [76 Cal.Rptr. 768]; *People* v. *Foust,* 267 Cal. App.2d 222, 228 [72 Cal.Rptr. 675]; *People* v. *Jackson,* 186 Cal.App.2d 307, 315 [8 Cal.Rptr. 849]; *People* v. *Mitchell,* 185 Cal.App.2d 507, 512 [8 Cal.Rptr. 319]; see *In re Banks,* 4 Cal.3d 337, 342 [93 Cal.Rptr. 591, 482 P.2d 215].)

In *People* v. *Marsden, supra,* 2 Cal.3d 118, the case upon which defendant relies, we held that the trial court had abused its discretion by refusing to listen to the reasons for which defendant had made a request for substitution of counsel. (*Id.* at pp. 123-124.)

The circumstances in this case substantially differ from those in *Marsden.* Here, the trial court asked for defendant's reasons for substitution and whether he had any other reasons. We cannot find that the trial court's denial of the motion was an abuse of discretion or that defendant's right to the assistance of counsel was substantially impaired by the denial. In a case similar to this we held that such a change would result in " 'a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' " (*People* v. *Durham,* 70 Cal.2d 171, 191 [74 Cal.Rptr. 262, 449 P.2d 198], quoting from *People* v. *Crovedi,* 65 Cal.2d 199, 208 [53 Cal.Rptr. 284, 417 P.2d 868]; see *People* v. *Glover,* 270 Cal.App.2d 255, 258-259 [75 Cal.Rptr. 629].)

■ Defendant contends that the form of the accusatory pleading was prejudicial to defendant. The information accuses the defendant of murder in that "he did unlawfully murder Clay Von Hastings, a human being, *for the purpose of robbery*." (Italics added.) Defendant contends that the phrase "for the purpose of robbery" was prejudicial in that it suggested to the jury that the felony-murder doctrine was applicable, providing an element of the offense which the jury must determine for itself. Any claim based upon the form of the pleading itself cannot be raised at this stage since no demurrer or objection was made at any time below. (See *People* v. *Failla*, 64 Cal.2d 560, 568 [51 Cal.Rptr. 103, 414 P.2d 39]; *People* v. *Kemp*, 55 Cal.2d 458, 474 [11 Cal.Rptr. 361, 359 P.2d 913].)

We do not feel that the reading of the phrase "for the purpose of robbery" would have prejudiced the jury. It did no more than inform all parties that the prosecution intended to rely on the felony-murder rule. The jury was instructed that they were not to be biased by the information filed against the defendant.

The remainder of defendant's contentions relate to the propriety of the penalty trial proceedings and are rendered moot by our decision in *People* v. *Anderson*, 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], holding that the death penalty may not be constitutionally imposed.

The judgment, insofar as it provides for the penalty of death, is modified to provide in place of the death penalty a punishment of life imprisonment and as so modified is affirmed in all other respects.

Wright, C. J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I concur in the opinion, except I dissent from the modification of the death penalty to life imprisonment.