[Crim. No. 10638. First Dist., Div. Four. Apr. 17, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM ALLEN BAIS, Defendant and Appellant.

664

## COUNSEL

Garret Shean, under appointment by the Court of Appeal, for Defendant and Appellant.

Sheldon Portman and Rose Elizabeth Bird as Amicus Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, W. Eric Collins and Nancy S. Reller, Deputy Attorneys General, for Plaintiff and Respondent.

D. Lowell Jensen, District Attorney, as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**RATTIGAN, J.**—Appellant William Allen Bais was charged by information with the robbery of Harry Darr on July 30, 1971, in violation of Penal Code section 211. The information also alleged that he had been armed with a deadly weapon at the time, and that he had two prior felony convictions. Before trial in the prosecution which followed, throughout which he was represented by the public defender, he admitted the prior convictions. A jury found him guilty as charged and fixed the crime as robbery in the first degree. He appeals from the judgment of conviction, contending that the trial court committed prejudicial error in granting a mid-trial prosecution motion for discovery of extrajudicial statements made by alibi witnesses.

The record of the prosecution's evidence supports the following summary thereof: Harry Darr (the robbery victim named in the information) was working in the office of Western States Stone, a business establishment in Hayward, at approximately 5 p.m. on July 30, 1971. Another employee, Bill Ratzburg, was also present. The two men were in the process of closing the place for the day. After Darr had deposited money in a safe in a storeroom, he observed an automobile arrive at the place

and park in the rear. When he and Ratzburg then stepped outside to examine a light fixture, two men approached them on foot. Each of the pair wore a ladies' nylon stocking over his head as a mask, and gloves on his hands. Each carried a handgun.

Darr recognized one of the men as appellant, whom he knew as a customer. The man he recognized ordered the two employees into the office, demanded "the money," and accompanied Darr to the storeroom safe. Darr opened the safe and handed $312 in cash to the man. The man returned to the office when his companion called that someone was coming.

Lloyd Silva, a customer who entered the place at this point, saw both armed men, thought he might be observing a "gag," and asked Darr what was going on. Darr replied "This is no joke, Lloyd, we're really being robbed." The robber with the money ordered Darr, Ratzburg and Silva into a restroom area and left with his companion. Ratzburg then called the police. The entire episode lasted about five minutes.

Darr identified appellant to the investigating police officer, and identified him again from a set of eight police photographs viewed that evening. Silva similarly identified appellant, from the same set of photographs, three months later.

Both Darr and Silva, testifying at the trial, made an in-court identification of appellant as one of the robbers. Darr described the clothing appellant had worn, and testified that he could not remember whether the two men had worn hats. (He had been unable to give a "clothing description" to the investigating officer or at appellant's preliminary examination, but testified on the latter occasion that both robbers had worn hats.) Ratzburg did not appear at appellant's trial.

The prosecution having rested, appellant presented an alibi defense through four witnesses who were called in the sequence next indicated. Cathy Rodriquez testified that she and some friends were in her home on the afternoon of the robbery, making "flowers for a wedding"; that appellant arrived at the home at about 1 p.m., and helped make the flowers; and that he did not leave the home until about 5 p.m. On direct examination, Ronnie Lee Harbeck testified that Cathy Rodriquez was his sister; that he lived with her and her husband; that he came home at about 4:50 p.m. on the day of the robbery, and saw appellant there; and that appellant was still there when he (Harbeck) left at 5:10 or 5:15 p.m.

The disputed prosecution discovery occurred at this point in the defense case. The circumstances attending it, and its aftermath, require detailed

examination because, as will appear, the trial record is less than complete. Following the direct examination of Harbeck, and prior to cross-examination, the prosecutor made the discovery motion in question.[1] Defense counsel made a timely and comprehensive objection, citing several decisions on the subject of prosecution discovery (including *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320 [85 Cal.Rptr. 129, 466 P.2d 673]). In the course of an extended discussion which followed outside the presence of the jury, the trial judge stated: "The difference in what we are considering here . . . [from] . . . the *Prudhomme* case, is that now an alibi witness has been sworn and testified. We [*sic*] are not asking for disclosure of names which would tend to incriminate . . ." He further indicated the view that the prosecution was entitled to the "statements," as sought (see fn. 1, *ante*), for use by way of impeachment. He then granted the prosecutor's motion, stating to defense counsel that "I'm going to permit him [the prosecutor] to discover statements that you have of the witness. . . . We will instruct the jury if there are any inconsistencies, they are only submitted for the purpose of impeachment."

The court then ordered defense counsel to deliver to the prosecutor the pretrial "statements" made by defense witnesses Rodriquez and Harbeck, and by other defense witnesses as and when they were called. In sequence, and as the court spelled out its order in detail, defense counsel handed the prosecutor "statements" given by Ronnie Harbeck and Cathy Rodriquez.[2]

After he had received the "statements," the prosecutor commenced the cross-examination of Harbeck. The witness reiterated that he had seen appellant in the Rodriquez home at and about 5 p.m. on the day of the robbery, and named the persons who had been present according to his present recollection. The following exchange then occurred: "Q. [by the prosecutor] Have you talked to anyone about this? A. No, I haven't. Q. Have you talked to an investigator from the Public Defender's Office? A. Yeah. Somebody came to talk to me. Q. You don't know who it was?

---

[1]He moved for discovery with this statement: "I would like to see any statements that might have been taken by any agents of the Public Defender's Office as to Cathy Rodriquez, as to Ronnie Lee Harbeck. I would ask to have, also, the statements of those witnesses that might be called by defense [*sic*] or that he plans on calling next."

[2]The record shows these deliveries in the following announcements by defense counsel: "I will give him [the prosecutor] a copy of Mr. Ronnie Harbeck's statement as transcribed by my investigator. . . . Let the record reflect I am handing him a copy of the statement given by Cathy Rodriquez." There is nothing in the record showing or suggesting that the trial court inquired concerning the contents of either document, or examined either, at any time.

A. No. Q. You remember telling him you can't really recall—you can't actually remember who was at the home when you came in? A. I told him what I know and that was it. Q. Did you tell him you couldn't remember who was in the house? A. I don't remember. That happened so long ago. Q. But you remember today who was in the house? A. Yeah. Q. But you can't remember whether you told the Public Defender's investigator or not, is that right? A. Yeah. Q. What did you do on July 29th, 1971, the day before the 30th? A. (No response.) Q. No idea? A. I don't know. Out looking for a job. I don't know. Q. What did you do on the 31st? A. (No response.) Q. Don't know? A. No."

The prosecutor did not further pursue the point of what Harbeck had told "the Public Defender's investigator." He (the prosecutor) made no direct reference to Harbeck's "statement" to the investigator, or to its contents. The "statement" was not at any time shown to the witness, offered in evidence, otherwise produced, or marked for identification. The "investigator" who had "transcribed" it (see fn. 2, *ante*) was not called to the stand.[3]

Appellant's father, next testifying for the defense, stated that he had arrived at his home between 5:15 and 5:30 p.m. on July 30, 1971; that appellant arrived there shortly later; and that appellant drove the witness to the bank at about 5:20 or 5:30 p.m.

Appellant testified in his own defense as follows: On the date in question, he was at Cathy Rodriquez' home, helping to make paper flowers. He saw Ronnie Harbeck come into the Rodriquez home at about 4:50 p.m. and leave 15 or 20 minutes later. Appellant took his father to the bank between 5 and 5:30 p.m., and waited outside. He knew the alleged victim of the robbery, but denied having been at the Western States Stone office on July 30 and denied any part in the robbery. On cross-examination, he admitted the two prior felony convictions alleged in the information.

After the defense rested, the prosecutor offered no evidence by way of rebuttal. There was a discussion at this point, and the trial court instructed the jury before final arguments commenced, concerning the prosecutor's use of a prior "statement" by Harbeck in the course of cross-examining him.[4]

---

[3]For these reasons, the Harbeck "statement" discovered by the prosecutor never became part of the trial record and, as will appear, the jury knew nothing of its existence until after all the evidence was in.

[4]The discussion, which took place prior to afternoon adjournment at the conclusion of the defense case, went as follows: "MR. BASKIN [defense counsel]: I don't foresee any problems on instructions. THE COURT: All right. Remind me, though, to instruct the jury on the limiting [*sic:* limited?] effect of the question that was asked Mr.

In his argument to the jury thereafter, the prosecutor twice referred to the same subject.[5]

After having been instructed, the jury retired to deliberate at 11:30 a.m. on Tuesday, November 30, 1971. That afternoon, the jury asked for and received a reading of the entire testimony of both Darr and Silva (the eyewitnesses to the robbery). The jury was adjourned at 6 p.m. on that day, and reconvened at 9 a.m. on Wednesday, December 1. At 3:55 p.m. on the second day, the foreman reported that the jury had been unable to arrive at a verdict after seven ballots, and was presently divided by a 9-3 vote (the opposing directions of which were not stated). The trial court then gave the so-called "*Allen* instruction"[6] and directed the jury to deliberate further. The jury returned its guilty verdict at about 5 p.m. on the second day.

Appellant contends that the order granting discovery of the Harbeck statement violated his Fifth Amendment privilege against compulsory self-incrimination and his Sixth Amendment right to effective counsel. His contention must be sustained on the first ground.

Harbeck. Will you call it to my attention? That is, for impeachment only. MR. JANSSEN [the prosecutor]: Certainly. MR. BASKIN: From a prior statement, you mean? THE COURT: Yes. MR. BASKIN: Which was never read to him. THE COURT: *It was referred to him.*" (Italics added.)

When the court was reconvened on the following morning, and after each side had declared itself to have rested, the court made this statement to the jury: "Before Mr. Janssen commences his argument, I meant to instruct the jury in one minor respect. That is, yesterday when Mr. Harbeck was testifying, Mr. Janssen *referred to a statement that he had previously made.* The jury is instructed that whatever use was made *of that statement* is to be considered by the jury only for the purpose of possible impeachment of Mr. Harbeck's testimony; and it is not to be considered by the jury as evidence of the truth of the matter that may have been contained in the *statement.*" (Italics added.)

[5]On the first occasion, the prosecutor said: "Ronnie Harbeck 4:50 on the dot he's at the [Rodriquez] apartment on the 30th. He remembers the 30th. He walks in the door and remembers who's sitting in that apartment. The *prior date* he couldn't remember." (Italics added.)

(Respondent contends that the last reference, to the "prior date," was to July 29, 1971, not the date upon which Harbeck gave a "statement" to the "Public Defender's investigator"; appellant claims the converse. Although the reference was ambiguous, it supports appellant's interpretation.)

In his closing argument to the jury, the prosecutor further stated: "I asked Mr. Harbeck if he saw anyone in the living room. He can't testify whether someone was in that house that he didn't see. He could only testify as to what he saw and he said he saw these people that he remembers today *but didn't remember in an earlier date that were in the living room.*" (Italics added.)

[6]For the text of this instruction, see, e.g., *People* v. *Ortega* (1969) 2 Cal.App.3d 884, 896, fn. 3 [83 Cal.Rptr. 260]; *People* v. *Ozene* (1972) 27 Cal.App.3d 905, 911 [104 Cal.Rptr. 170]. For its apparent source ("*Allen*"), see *Allen* v. *United States* (1896) 164 U.S. 492, 501 [41 L.Ed. 528, 530-531, 17 S.Ct. 154].

In *Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320, the Supreme Court granted prohibition against the enforcement of a *pretrial* discovery order which would have compelled a criminal defendant's attorney "to disclose to the prosecution the names, addresses and expected testimony of the witnesses . . . [the defendant] . . . intends to call at trial." (*Id.* at p. 322.) After discussing a decision cited by the People as precedent for the order (*Jones* v. *Superior Court* (1962) 58 Cal.2d 56 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213]), and another setting forth the broad dimensions of the constitutional privilege against self-incrimination (*People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841]), the court spelled out the mandatory standard to be applied by trial courts in acting upon applications for discovery by criminal prosecutors. The court stated: ". . . [I]f we analyze *Jones* in the light of the policy considerations discussed in *Schader,* it is apparent that the principal element in determining whether a particular demand for discovery should be allowed is not simply whether the information sought pertains to an 'affirmative defense,' or whether defendant intends to introduce or rely upon the evidence at trial, but whether disclosure thereof conceivably might lighten the prosecution's burden of proving its case in chief. Although the prosecution should not be completely barred from pretrial discovery, defendant must be given the same right as an ordinary witness to show that disclosure of particular information could incriminate him. [Par.] An ordinary witness need not actually prove the existence of an incriminatory hazard as that would surrender the very protection which the privilege against self-incrimination was designed to guarantee. Instead, the privilege forbids compelled disclosures which could serve as a 'link in a chain' of evidence tending to establish guilt of a criminal offense; in ruling upon a claim of privilege, the trial court must find that it clearly appears from a consideration of all the circumstances in the case that an answer to the challenged question cannot possibly have a tendency to incriminate the witness. (Citations.)" (*Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320 at p. 326 (fn. omitted).)

Applying the test to the order before it, the *Prudhomme* court held that it was invalid because it could not be ascertained from the order, or from the record, whether the matters to be disclosed "cannot possibly have a tendency to incriminate" the defendant. (*Ibid.*) On this point, the court noted that "[i]t requires no great effort or imagination to conceive of a variety of situations wherein the disclosure of the expected testimony of defense witnesses, or even their names and addresses, could easily provide an essential link in a chain of evidence underlying the prosecution's case in chief. . . . Thus the order before us is too broad, for it could require petitioner [the defendant] to disclose information which

might serve as a link in a chain of evidence tending to establish her guilt of a criminal offense. In ruling upon petitioner's claim of privilege, the trial court failed to inquire into the incriminatory nature of the information sought, acting upon the assumption that *Jones* and *Pike* [*People* v. *Pike* (1969) 71 Cal.2d 595 (78 Cal.Rptr. 672, 455 P.2d 776)] authorized disclosure without regard to possible incriminatory effect. Since the order was for this reason violative of petitioner's constitutional rights, it was beyond the court's jurisdiction and therefore void and unenforceable." (*Id.* at pp. 326-327 (fn. omitted).)

It appears that the present trial court granted the discovery motion upon the assumption that the matters proposed for discovery were not such as "would tend to incriminate" appellant. This was a different basis for granting the motion than the trial court had employed in the *Prudhomme* case. (*Prudhomme* v. *Superior Court,* quoted *supra,* 2 Cal.3d 320 at p. 326.) It was nonetheless an assumption, and the trial court authorized disclosure without verifying the assumption by examining the demanded materials before acting upon the motion. (See fn. 2, *ante.*) In ruling upon appellant's claim of privilege, the court therefore "failed to inquire into the incriminatory nature of the information sought, . . . Since the order was for this reason violative of [appellant's] constitutional rights, it was beyond the court's jurisdiction and therefore void and unenforceable." (*Id.* at pp. 326-327 (quoted *supra*).)

Respondent contends that the *Prudhomme* test is inapplicable because the prosecutor's motion for discovery was made during appellant's trial and after the prosecution had rested. This argument is based upon the language of the *Prudhomme* decision (quoted *supra*), which defines the applicable test as to whether the requested disclosure "conceivably might lighten the prosecution's burden of proving its case in chief." (*Id.* at p. 326.) The Attorney General states the argument as follows: "*Prudhomme* approves by implication the discovery of matters not properly part of the prosecution's case in chief. Negating an alibi defense is not part of the case in chief. Impeaching the credibility of alibi witnesses is proper rebuttal."

This argument must be rejected for several reasons. In the first place, it rests upon an interpretation of the term "case in chief" as the opening procedural stage of a criminal trial which concludes when the prosecution rests. (See Pen. Code, § 1093, subd. 2.) The interpretation comports with conventional trial parlance, but the argument ignores the fact that the prosecution "for good reason, in furtherance of justice," may be permitted

to reopen its "case in chief" as thus interpreted. (*Id.* subd. 4.) In the event of a valid mistrial, moreover, a new "case in chief" (thus interpreted) would be commenced at a subsequent trial. It is entirely conceivable that the results of a given discovery, whenever made, could "lighten the prosecution's burden in proving its case in chief." Apart from such possibilities, the Attorney General's narrow interpretation of "case in chief" is too technical to be applied in derogation of a constitutional privilege. In our view, the *Prudhomme* court's reference to the prosecution's "case in chief" was appropriate because the court was dealing with a *pretrial* discovery order. However, the reference may not be construed to mean that a discovery cannot "lighten the prosecution's burden," in the constitutional sense, for the sole reason that it occurs after the prosecution has rested. This construction would import that a defendant's constitutional privilege against self-incrimination is suspended at a given point in his trial. The *Prudhomme* court's full discussion of the privilege precludes such reasoning. (*Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320 at pp. 323-326.)

It follows that prosecution discovery must be denied, regardless of when requested, if the trial court determines that the matters to be disclosed will conceivably "lighten" the "burden" which the prosecution bears *in bringing about a conviction of the accused.* "Negating an alibi defense" may very well produce this result, irrespective of the fact that it would be done through the medium of rebuttal evidence. The *Prudhomme* test consequently applies, and bars the discovery ordered here.[7]

In addition, the Attorney General's argument fails because the prospect of "negating an alibi defense" was by no means the only possible consequence of the discovery requested in the present case. The prosecutor apparently had the prospect in mind when he moved for discovery, although he did not say so (see fn. 1 and accompanying text, *ante*); but, even if he had announced his specific purpose, the contents of the requested documents were obviously not known to be limited to that purpose. In short, he was requesting entry to a Pandora's box. As the *Prudhomme* court indicated, "[i]t requires no great effort or imagination to conceive of a variety of situations wherein the disclosure . . . could easily provide an essential link in a chain of evidence underlying the prosecution's case in

---

[7]At this point, we mention—and emphasize—that we are interpreting *Prudhomme* as a constitutional inhibition, under the Fifth Amendment, of mid-trial prosecution discovery pertaining to alibi witnesses for the defense; that we do so in the absence of any California statute permitting such discovery (*Rodriguez* v. *Superior Court* (1970) 9 Cal.App.3d 493, 495, 497 [88 Cal.Rptr. 154]); and that we do not mean to suggest that it violates the Fifth Amendment privilege if ordered in compliance with a constitutional statute. (See *Williams* v. *Florida* (1970) 399 U.S. 78, 81, 86 [26 L.Ed.2d 446, 449-450, 452, 90 S.Ct. 1893].)

chief." (*Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320 at p. 326.) The possibilities emphasize the requirement that the trial court examine the matters to be disclosed before granting prosecution discovery; the failure of the present trial court to do this was the essential error.

Respondent alternatively contends, in effect, that the trial court complied with the *Prudhomme* test by referring to the testimony of Rodriquez and Harbeck and by determining from *those sources* that the documents requested could not be "incriminatory" as to appellant. But the court obviously could not make this determination from the testimony of either witness; examination of the documents was required. The trial court having failed to conduct such examination, there was no compliance with the *Prudhomme* test.

■ Respondent further contends in effect that the error was not prejudicial because the contents of the prosecution-discovered "statement" by Harbeck were not "incriminatory," as such or as to appellant, and because the prosecutor did not actually use the documents to "impeach" Harbeck's credibility. Both arguments raise the troublesome problem— involving the state of the record on appeal—resulting from the fact that Harbeck's pretrial "statement," as discovered by the prosecutor and delivered to the latter (see fn. 2, *ante*), did not become part of the trial record. (See fn. 3, *ante.*) Despite this conspicuous omission, appellant has inserted a purported (but not authenticated) facsimile of the "statement" in his opening brief, and all parties[8] speak to its contents as if the document were properly before us. It is *not* properly before us: because it never became part of the record below, there is no way—through augmentation or otherwise—that its contents may be considered for any purpose on the appeal. This disposes of respondent's contentions that the *contents* of the document were not "incriminatory"; the principal question pertains to its *use*.

It is true that the prosecutor did not expressly refer to the document in cross-examining Harbeck, that he did not complete a conventional process of impeaching the witness with it, and that he did not elicit from Harbeck the essentially impeaching fact that he (Harbeck) had made a prior extrajudicial statement inconsistent with his current testimony as an alibi witness in appellant's defense. (See the text hereof preceding fn. 3, *ante.*) On the other hand, the prosecutor's interrogation of Harbeck (quoted *supra*) strongly suggests that the critical questions were based upon the

---

[8]"All parties" include appellant, respondent and the California Public Defenders Association (amicus curiae).

discovered "statement," the trial court unmistakably concluded as much (see fn. 4, *ante*), and all parties argue from this premise in their respective briefs. Under the circumstances, and although the record does not permit us to resort to the missing document *itself* in this regard, we may—and do—conclude that its discovery prompted the prosecutor's critical questions in cross-examining Harbeck.

This being so, the discovery unquestionably prompted the prosecutor's statements, in final argument, in which he in effect informed the jury that Harbeck had made a prior inconsistent statement; it was at this point that the discovery did its real damage by way of impeaching Harbeck. ■ Respondent contends that the statements to the jury fall into the area of prosecutorial misconduct, of which appellant may not complain because defense counsel did not object, or request an appropriate admonition of the jury, when either was made.[9] Such misconduct may be considered on appeal, however, although not assigned as error at the trial, if, "the case being closely balanced and presenting grave doubt of the defendant's guilt, the misconduct contributed to the verdict or [if] the harmful results of the misconduct could not have been obviated by a timely admonition to the jury." (*People* v. *Floyd* (1970) 1 Cal.3d 694, 722 [83 Cal.Rptr. 608, 464 P.2d 64].)

■ We regard the present case as "closely balanced and presenting grave doubt of the defendant's guilt"; the jury, deliberating for eleven hours through two days and eight ballots, obviously so regarded it. Because the jury deliberated at such length concerning a direct—and essentially simple—conflict between eyewitnesses and alibi witnesses, which it finally resolved in favor of the testimony of the former, we conclude that the misconduct "may have contributed to the verdict." (*People* v. *Floyd, supra,* 1 Cal.3d 694 at p. 722.) Moreover, a "timely admonition" to the jury, to disregard the prosecutor's comments, would have instructed the jury to disregard his reference to the alleged fact that Harbeck had given a pretrial "statement" at all. In light of the fact that the trial court had already instructed them that he had, and that they were to consider it for impeachment purposes only (see fn. 4 (second paragraph) and accompanying text, *ante*), the admonition would very likely have compounded the original error by confusing the jury entirely.

It therefore appears that appellant may assert the misconduct on appeal. (*People* v. *Floyd, supra,* 1 Cal.3d 694 at p. 722.) Once asserted, of

---

[9]The Attorney General concedes that at least one of the prosecutor's statements, having been unsupported by impeachment evidence, constituted misconduct as here discussed. (See fn. 5, *ante*.)

course, it must be assessed in its full dimensions: not as a fleeting instance of prosecutorial misconduct in the usual sense, but as the capstone of the trial court's original constitutional error in granting discovery.

Respondent's final argument is that evidence may constitutionally be used for impeachment purposes even if unconstitutionally obtained. This argument relies upon *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], in which the United States Supreme Court sanctioned the impeachment of a defendant with statements taken from him by the police in violation of his *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. See *Harris* v. *New York, supra,* at pp. 223-224 [28 L.Ed.2d at pp. 3-4].) Such reliance is misplaced. The defendant in *Harris* had testified at substantial variance with the statements he had given the police. (*Id.* at p. 223 [28 L.Ed.2d at p. 3].) The rationale of the decision is that "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (*Id.* at p. 226 [28 L.Ed.2d at p. 5].)

In the present case, there is no indication that Harbeck gave perjured testimony. (Had this been indicated by a pretrial "statement" he had given to the defense investigator, we may reasonably assume that the prosecutor would have used it to impeach him.) Moreover, the pretrial statement in *Harris* had been given to the police, from whom the prosecutor obtained it for use in impeaching the defendant. Here, the disputed witness "statement" had been in possession of the defense until the trial court ordered its discovery. It is one thing to allow the fruits of a constitutional violation to be used, for cause, after it has occurred outside the trial court. It would be quite another matter to permit it to occur at the hands of the court itself. For these reasons, *Harris* is inapplicable.

Because the trial court's discovery error violated appellant's Fifth Amendment privilege against compulsory self-incrimination, it was of federal constitutional dimensions. (*Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320 at pp. 323-326.) Consequently, the judgment may not stand unless we find that the error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) We again note that the jury deliberated for eleven hours, through two days and seven ballots, and reached its verdict only after receiving the "*Allen* instruction" in last resort. The conflict before them was squarely between the eyewitnesses and alibi testimony. The eyewitness identifications of appellant were by no means insub-

stantial, but they were made of a masked robber and were not entirely free of discrepancy. As appellant's own alibi testimony was discredited to some extent by the showing that he was a two-time felon, it is apparent that the jury was not readily inclined to disregard that of Cathy Rodriquez and Ronnie Lee Harbeck. Operating in final analysis to discredit the testimony of Harbeck, the error and its consequences also shadowed the concurring testimony of Rodriquez. Given all these circumstances, we are not "able to declare a belief that [the error] was harmless beyond a reasonable doubt." (*Chapman* v. *California, supra.*)

Appellant and amicus also ask us to hold that the error constituted a prejudicial violation of appellant's Sixth Amendment right to effective counsel. The *Prudhomme* court declined to discuss an identical argument when raised in conjunction with the Fifth Amendment point which produces reversal here. (See *Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320 at p. 322.) Following the Supreme Court on one point, we are not inclined to attempt to lead it on the other.

The judgment is reversed.

Devine, P. J., and Bray, J.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 13, 1973.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.