[Crim. No. 2319. Fifth Dist. Oct. 20, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
AUGUSTINE CASTANEDA, Defendant and Appellant.

**COUNSEL**

Jack K. Weber, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General,

James T. McNally and Gregory W. Baugher, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FRANSON, Acting P. J.—**

### STATEMENT OF FACTS

On December 28, 1974, appellant, a Mexican citizen and an illegal alien who spoke no English, was employed at a labor camp on Highway 140 in Merced. Room 7 at Camp No. 1 was shared on this date by Florentino Castaneda Ceja, Francisco Rodriguez Castaneda and Alfredo Castaneda Ceja.

In the late afternoon and evening of December 28, Florentino and Francisco met and had beer at the 140 Club on Highway 140 adjacent to the labor camp. Appellant came alone to the 140 Club early in the afternoon, left, and then returned sometime after Florentino and Francisco arrived. The 140 Club closed at 1:45 a.m. Francisco went into the bathroom just prior to closing time and saw appellant having an argument with the victim. A person clothed like the victim had gone into the bathroom prior to closing and prior to purchasing a pack of Marlboro cigarettes. Florentino left the bar at closing time alone and went back to the labor camp to sleep without noticing an altercation outside the bar. Francisco also left the 140 Club at closing time. Outside the bar he saw appellant and the victim having an argument during which appellant threw a six-pack of beer at the victim. Francisco and, apparently, Florentino decided to return to the labor camp. Francisco believed a fight was about to begin.

Approximately 15 or 20 minutes after Francisco and Florentino left the bar, appellant came to their room stating that he had been in a fight with a man and was going back to where the man was located. Appellant left the room and returned sometime later. He then demanded that Florentino and Francisco give him some money and that he would implicate them in the fight if they didn't do so. Appellant also stated words to the effect that he was going to make sure the man was dead; that he was going to finish killing him. Alfredo Castaneda Ceja, who was sleeping when appellant entered the room, heard him state that he had

had a fight with a man. Alfredo saw the appellant take with him an iron bar with two hooks in it, although Florentino and Francisco did not see appellant take the bar.

The body of the victim was found the following morning, December 29, in a vacant lot off Highway 140 next to the 140 Club. The body was lying face up with arms outstretched. Dirt marks near the arms indicated that the victim had thrashed his arms back and forth like a man making "angels in the snow." There was a considerable amount of dirt on the face of the victim, although bloodstains appeared to have flown from the face toward the back. Pathologist James Andrew Wilkerson determined the cause of death to be "suffocation from multiple traumatic and physical injuries." Dr. Wilkerson described the injuries as including a five and one-half-inch laceration across the eyebrows and bridge of the nose as well as numerous other lacerations on the face and skull, broken teeth, facial bones, jaw and a broken skull over the left eye. It was determined that the death had occurred at approximately 7 a.m., although the various wounds themselves could have been as much as 12 hours old. Because of the nature of the wounds, Dr. Wilkerson surmised that they were caused by a blunt instrument, possibly a brick, which struck the victim with considerable force.

Officer David Hammond of the Merced County Sheriff's office found amounts of broken glass, rocks and bricks around the victim which appeared to be marked with blood. He also found a package of Marlboro cigarettes in the victim's clothing from which one or two cigarettes were missing. The iron bar described by Alfredo was not found.

Appellant was arrested by Officer Hammond at 10:30 a.m. at the World Gas Station on 13th and J Streets in Merced.

### EXTRAJUDICIAL STATEMENTS OF APPELLANT

■ Appellant makes several contentions concerning two extrajudicial statements which he made to the police and which were introduced by the People as rebuttal evidence. Appellant was interrogated on December 29, 1974, and January 2, 1975. During the December 29 interrogation appellant stated that he, Francisco and Florentino had killed the victim in a fight and that he had hit the victim with a brick. During the January 2 interrogation appellant answered affirmatively when asked whether he had told Francisco and Florentino that he had killed the victim.

Appellant contends that it was misconduct on the part of the prosecutor to introduce the statements in rebuttal. The contention is without merit for two reasons: First, appellant failed to object to the introduction of the statements on the specific ground that they were not proper rebuttal or impeachment evidence. As the order of proof lies within the sound discretion of the trial court (Pen. Code, § 1094), the absence of a specific objection to the rebuttal testimony constitutes a waiver of the right to claim the trial court abused its discretion. (Evid. Code, § 353, subd. (a); *People* v. *Mosher,* 1 Cal.3d 379, 399 [82 Cal.Rptr. 379, 461 P.2d 659].)

Second, a claim of prosecutorial misconduct cannot be assigned as error on appeal where there was no objection to that conduct in the trial court "unless the case being closely balanced and presenting grave doubt of the defendant's guilt, the misconduct contributed materially to the verdict." (*People* v. *Varnum,* 70 Cal.2d 480, 488 [75 Cal.Rptr. 161, 450 P.2d 553]; *People* v. *Washington,* 71 Cal.2d 1061, 1083-1084 [80 Cal.Rptr. 567, 458 P.2d 479].) Appellant admitted on cross-examination that he had struck the victim with a brick; he admitted on direct examination and cross-examination that he had been fighting with the victim. It was established that the victim had died of suffocation resulting from the collapse of broken facial bones inflicted by a blunt instrument, possibly a brick. Three witnesses testified that appellant had stated in substance that he was going to finish off a man with whom he had been fighting. Because of the strong evidence of defendant's guilt, we cannot say that the misconduct, if any, contributed to the verdict.

Appellant next argues that the trial court should have *sua sponte* determined the voluntariness of his statements before allowing the statements into evidence for impeachment purposes. Again, appellant made no objection on this specific ground, and there was no evidence that he had been subjected to physical or psychological coercion in making his statements. As stated in *People* v. *White,* 43 Cal.2d 740, 745 [278 P.2d 9]: "Defendant contends that it was error to admit Parker's testimony without preliminary proof that the confession was free and voluntary. Defendant did not object to the admission of the testimony . . . on the ground and apparently no testimony was introduced at the trial indicating that the confession had been obtained by improper threats or promises. It is true that a confession not shown to have been freely and voluntarily made cannot be used for the purpose of impeachment [citation]; however, when no objection has been made in the trial court as to the involuntariness and no evidence is presented to show the

involuntariness of the confession, it is not error to admit it for the purpose of impeachment [citation]." (See *People* v. *Walters,* 189 Cal.App.2d 334, 336 [11 Cal.Rptr. 307].) (See also *People* v. *Millum,* 42 Cal.2d 524, 526-527 [267 P.2d 1039]; *People* v. *Kaminsky,* 204 Cal.App.2d 300, 302 [22 Cal.Rptr. 191].)

■ Appellant next contends that because the prosecution failed to prove that he had received and had waived his *Miranda* rights before giving the statements that it was improper to use them for impeachment purposes because he did not "exercise a license to commit perjury," citing *People* v. *Taylor,* 8 Cal.3d 174, 182 [104 Cal.Rptr. 350, 501 P.2d 918] and *People* v. *Bais,* 31 Cal.App.3d 663, 675 [107 Cal.Rptr. 519]. In *Taylor,* our Supreme Court interpreted *Harris* v. *New York* (401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]) as standing for the narrow proposition that in a narcotics case a statement inadmissible as substantive evidence because of *Miranda* violations may be used to impeach a defendant's credibility only where on direct examination he makes a sweeping claim that he has never dealt in or possessed any narcotics. It held the evidence inadmissible for any purpose if the defendant merely denies committing the crime charged and it is the prosecutor on cross-examination who "elicits an expected denial of his equally sweeping question asking if the defendant has ever engaged in narcotics activity before." (*People* v. *Taylor, supra,* 8 Cal.3d at p. 182.)

In *People* v. *Bais, supra,* it was held that where there is no indication that the defendant has given perjured testimony a prior statement obtained in violation of his constitutional rights cannot be used to impeach his testimony. The court noted that the defendant's testimony on direct and cross-examination did not substantially vary from his prior statement. *Bais* is also distinguishable in that the prior statement was obtained from the defense by means of a discovery order in violation of the defendant's Fifth Amendment privilege against self-incrimination. The reviewing court stated: "It is one thing to allow the fruits of a constitutional violation to be used . . . after it has occurred outside the trial court. It would be quite another matter to permit it to occur at the hands of the court itself. For these reasons, *Harris* [v. *New York*] is inapplicable." (31 Cal.App.3d at p. 675.)

In *People* v. *Nudd,* 12 Cal.3d 204, 207-208 [115 Cal.Rptr. 372, 524 P.2d 844], a majority of our Supreme Court appears to have broadened its *Taylor* interpretation of *Harris* by holding in a narcotics possession case that an out-of-court statement inadmissible as substantive evidence for

violating *Miranda* nevertheless may be used to impeach a defendant's credibility where the defendant has given testimony inconsistent with his prior statement, and the statement is otherwise trustworthy. It expressly approved the following language in *Harris* v. *New York, supra:* " '. . . Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. . . . [¶] The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.' " (12 Cal.3d at p. 208.) (See also *Oregon* v. *Hass* (1975) 420 U.S. 714, 720-724 [43 L.Ed.2d 570, 576-578, 95 S.Ct. 1215, 1220-1221].)

We conclude from these cases that where a defendant takes the stand and testifies to a fact relevant to his guilt or innocence in a manner substantially at variance with a prior out-of-court statement he may be impeached by the prior statement even though obtained in violation of *Miranda.* In the present case appellant had given testimony inconsistent with some of his statements during the December 29 and January 2 interrogations. He testified that he did not have a brick or a rock when he hit the victim and that Francisco had had a brick in his hand. On December 29 he stated that he had hit the victim with a brick. On January 2 he stated that Francisco did not have a brick or rock in his hand; he also inferentially stated that he had struck the victim with a brick. Contrary to his January 2 statement, on cross-examination he denied telling Francisco and Florentino that he had killed the victim.

Additionally, the questions asked by the prosecutor on cross-examination were specific and related to the statements made at the interrogations and were not of the broad, sweeping-type condemned in *Taylor.* We hold that appellant's extrajudicial statements, although received in violation of *Miranda,* were properly admitted to impeach his credibility.

### Diminished Capacity

Appellant contends the trial court erred in failing to consider whether his intoxication negated malice aforethought thereby reducing his offense to manslaughter. He also contends that the recent decision in *People* v. *Ray* (14 Cal.3d 20 [120 Cal.Rptr. 377, 533 P.2d 1017]) changed

the law with respect to the defense of diminished capacity due to intoxication and its relation to involuntary manslaughter. The contentions are without merit.

The record indicates that the trial court considered the question of the absence of malice as a result of intoxication in deciding whether appellant was guilty of second degree murder or manslaughter and requested that counsel argue the point. At no time does the record indicate that the judge believed appellant had to be unconscious before involuntary manslaughter could be considered.

The trial court is presumed to know and follow the law. (*People* v. *Hoxie*, 252 Cal.App.2d 901, 914 [61 Cal.Rptr. 37].) In *People* v. *Ray*, *supra*, the Supreme Court did not change the existing law, but only purported to clarify its holdings in *People* v. *Tidwell*, 3 Cal.3d 82 [89 Cal.Rptr. 58, 473 P.2d 762], and *People* v. *Mosher*, *supra*, 1 Cal.3d 379, because of confusion resulting from the case of *People* v. *Roy*, 18 Cal.App.3d 537 [95 Cal.Rptr. 884]. The court in *Ray*, at page 30, points out: "Notwithstanding the significant body of law which appears to lend some support to the view expressed in *Roy*, it was not our intention to imply in *Mosher* or *Tidwell*, or in any earlier decision dealing with the issue, that an instruction on involuntary manslaughter in the context of diminished capacity based on intoxication is to be applicable *only* on evidence of the accused's unconsciousness . . . . But if an accused is unable to harbor malice and an intent to kill because of voluntary intoxication which does not render him unconscious he cannot be guilty of an unlawful homicide greater than involuntary manslaughter and the jury must be so instructed."

In the present case, the trial court's finding that the killing was committed with malice is amply supported by the facts. The victim's wounds indicated repeated forceful blows with a blunt instrument; several witnesses testified that appellant came into their room at the labor camp and admitted killing someone; and appellant himself admitted striking the victim. Appellant admits in his brief that the evidence of intoxication was "not overwhelming." Appellant testified that he had not had a lot to drink on the night in question and witnesses testified that his speech did not seem to be impaired. The only testimony that appellant was "drunk" came from a witness who himself had been drinking. Thus, the evidence of intoxication was not sufficiently strong as a matter of law to negate malice aforethought. The evidence supports the trial court's finding of second degree murder.

## Effective Waiver of Jury Trial

█ Appellant contends that his waiver of a jury trial was ineffective because of the trial court's failure to more fully explain the nature and consequences of a trial by jury. He argues that he does not speak English, is a Mexican citizen, and that in all the proceedings an interpreter was utilized.

The record reflects the following:

"THE COURT: All right. Mr. Castaneda, your attorney, Mr. Ellery, tells me you wish to give up your right to a jury trial in this case.

"DEFENDANT CASTANEDA: I don't want a jury.

"THE COURT: All right, Mr. Castaneda, you understand that you have a right under our Constitution to a trial before a jury?

"DEFENDANT CASTANEDA: I want to put it aside.

"THE COURT: All right.

"DEFENDANT CASTANEDA: I want the Judge to look at the charges against me.

"THE COURT: I want to make sure, Mr. Castaneda, that you understand what a jury trial is. Do you know how many people are on a jury?

"DEFENDANT CASTANEDA: I don't know, sir.

"THE COURT: All right. Mr. Castaneda, there are twelve people on a jury. Those people would hear the evidence presented by the District Attorney. It would be necessary for all twelve to agree before you could be found guilty.

"Do you understand what I have said, Mr. Castaneda?

"DEFENDANT CASTANEDA: Not too well, sir.

"THE COURT: All right. Do you have any questions of me about what I have just said?

"DEFENDANT CASTANEDA: No, sir, I'm just saying that I just want you to listen to my—to the crime as it was.

"THE COURT: Do you believe that, Mr. Ellery, under the circumstances would be a sufficient waiver?

"MR. ELLERY: Your Honor, yes. I, through Mr. Macias, I spent I would say over an hour, between one and two hours discussing this decision with the Defendant. I think it was within the week, and this was the decision that he and I mutually agreed upon.

"I have spoken to him about—I have mentioned to him before that twelve people are on a jury and all twelve must agree upon a decision and I feel that he has elected to waive a jury and it's an intelligent waiver.

"THE COURT: All right. Mr. Castaneda, do you wish this case to be tried by a judge alone now?

"DEFENDANT CASTANEDA: Yes."

In determining whether there has been an effective waiver of a jury trial in favor of a court trial, the cases do not require a specific formula or extensive questioning beyond assuring that the waiver is personal, voluntary and intelligent. (*People* v. *Miller,* 7 Cal.3d 562, 567 [102 Cal.Rptr. 841, 498 P.2d 1089]; *People* v. *Tijerina,* 1 Cal.3d 41, 45-46 [81 Cal.Rptr. 264, 459 P.2d 680]; *People* v. *Lookadoo,* 66 Cal.2d 307, 312-314 [57 Cal.Rptr. 608, 425 P.2d 208]; *People* v. *Monk,* 56 Cal.2d 288, 298 [14 Cal.Rptr. 633, 363 P.2d 865].)

In *People* v. *Acosta,* 18 Cal.App.3d 895 [96 Cal.Rptr. 234], the defendant who spoke only Spanish was held to have made an effective waiver of a jury trial. The trial court questioned the defendant through an interpreter after the waiver and ascertained that it was personal. However, the trial court did not explain to the defendant the difference between the two types of trial or their relative advantages or disadvantages. The court stated at page 902: "Certainly a court is in no position to discuss the merits of the two kinds of trial, either philosophically or tactically, with a defendant where the defendant is represented by competent counsel. It is enough that the court determine that the defendant understands that he is to be tried by the court and not a jury."

In the case at bar, the appellant personally stated that he did not want a jury and that he wanted the judge to look at the charges against him. Appellant's counsel told the judge that he had spent between an hour and two hours discussing the matter with appellant and that they had agreed to waive the jury trial. We hold that appellant made an effective waiver of his right to trial by jury.

The judgment is affirmed.

Thompson, J.,* and Ginsburg, J.,† concurred.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

†Assigned by the Chairman of the Judicial Council.