[Civ. No. 380.   Third Appellate District.—December 24, 1907.]

## MINNIE ZIPPERLEN and BERNHARD ZIPPERLEN, Respondents, v. SOUTHERN PACIFIC COMPANY, Appellant.

NEGLIGENCE—COLLISION OF BACKING TRAIN WITH WAGON—SUPPORT OF VERDICT.—Upon a review of the evidence, in an action for damages for personal injuries to a wife, caused by the negligent collision of a backing train with a wagon, with which she was crossing the street, *held*, that the evidence is sufficient to support the verdict for the plaintiff, whether the evidence is considered on the theory that the persons in charge of the backing train had the last clear opportunity to avoid the injury, after the discovery of the peril of the wife, or on the theory that they were grossly negligent in not using any care whatever to learn whether the street crossing was clear before backing the train thereupon.

ID.—PROVINCE OF JURY—CONFLICTING EVIDENCE—CREDIBILITY OF WITNESSES.—It was the province of the jury to pass upon all questions of conflicting evidence or inconsistent statements, or the credibility of witnesses, and its verdict cannot be disturbed for insufficiency of the evidence when there is any evidence to support it.

ID.—INSTRUCTION PERTINENT TO EVIDENCE—DUTY TO KEEP LOOKOUT.—An instruction, based upon pertinent evidence as to the attempt of plaintiff to cross when the train was at a standstill, and as to her inability to control her horse, when the train was suddenly backed, to the effect that the law imposed upon the servants of the defendant the duty to keep a lookout, and to observe and ascertain whether the crossing was clear, and that if they failed to do so, and the plaintiff was thereby injured without fault on her part, their verdict should be for the plaintiff, was correctly given.

ID.—EVIDENCE—CONTRADICTION OF WITNESS BY PARTY CALLING HIM—SURPRISE.—Where a witness called by a party has given testimony damaging to the party producing him, and it appears that the party by whom he has been produced has been misled and taken by surprise, and had reason from his previous statement to believe that the witness would give testimony favorable to his side, there is no reason upon principle why such party should not be allowed to contradict his own witness, who has betrayed him, and by his unexpected testimony placed the party producing and standing sponsor for him in a false light before the court or jury. The preliminary question of surprise and of the method of proof thereof is in the sound discretion of the trial court.

ID.—QUESTION PART OF RES GESTAE.—A question addressed to the fireman by the engineer, in the presence of the party injured, immediately following the accident: "Why didn't you tell me to stop?" was asked so near the time the accident occurred as to make it part of the transaction, and admissible under the rule of *res gestae*. The mere fact that the accident preceded the question does not necessarily take it out of that rule.

APPEAL from a judgment of the Superior Court of Fresno County. H. Z. Austin, Judge.

The facts are stated in the opinion of the court.

L. L. Cory, for Appellant.

Geo. W. Cartwright, and Edgar S. Van Meter, for Respondents. ·

HART, J.—Action for damages for personal injuries. The verdict of the jury was in favor of plaintiffs for the sum of $4,125.00, and, agreeably to said verdict, judgment was entered in their favor for that sum. The appeal, supported by a bill of exceptions, is from said judgment.

The defendant corporation, at the time plaintiff, Mrs. Zipperlen, received the injuries for which reparation in damages is sought through this action, operated a steam railway through and over certain public streets in the city of Fresno.

On the thirteenth day of February, 1900, said plaintiff was traveling in a conveyance, drawn by a single horse, along Tuolumne street, in said city. The complaint alleges that said street was "a regularly laid out, open and traveled public highway in the said city of Fresno from the west part of said city to the east part thereof," and that said street crosses the railroad tracks of defendant at a point between G and H streets in said city. While the plaintiff was attempting to cross said tracks on said Tuolumne street, the vehicle in which she was riding was struck by a locomotive or "yard engine," used by defendant for "switching purposes," with the result that she was thrown with great violence to the ground, sustaining a fracture of the thigh, or, technically, the femur bone, and other less serious injuries.

The plaintiff alleges that the injuries suffered by her were due to the negligence of the defendant. The claims of the

plaintiffs are resisted by the defendant upon the ground of contributory negligence.

A reversal of the judgment is insisted upon for the following reasons: 1. "That the evidence discloses, without substantial conflict, that the accident was occasioned by the contributory negligence and want of care of the plaintiff"; 2. "The court erred in allowing in evidence, as against this defendant, a certain conversation of the engineer of the defendant long after the accident occurred"; 3. "Errors of the court in allowing, and refusing to give, certain instructions to the jury."

From the nature of the instructions submitted to the jury by the court, it is evident that the case was tried upon two distinct and diametrically opposite theories, viz.: 1. Knowledge on the part of the engineer of the perilous position of Mrs. Zipperlen and his failure to exercise the care imposed upon him under such circumstances to prevent the accident resulting in the damage; 2. Want of knowledge on the part of the engineer that anyone at all was attempting to make the crossing, due to his gross carelessness, and negligence in not looking before and while the engine was moving toward the crossing to ascertain whether or not it was clear. The first stated proposition, it will be noted, involves what is known as the doctrine of the "last clear opportunity"—that is, that the engineer, having discovered Mrs. Zipperlen's perilous situation before damage was done, failed to exercise ordinary care to prevent the accident. (*Bennichsen* v. *Market St. Ry. Co.*, 149 Cal. 22, [84 Pac. 420].) The second proposition involves the contention that the engineer moved his engine toward the crossing without exercising any care whatever, or in total disregard of the duty as to care imposed upon him—that is, without looking down the track on which his engine was moving to learn whether the crossing was clear or in use by some traveler.

In order that a clear understanding may be conceived of two of the points urged against the validity of the judgment—insufficiency of the evidence to sustain the verdict of which the judgment is predicated and errors in the giving of certain instructions—it will be necessary to review the evidence to some extent.

The testimony of the engineer Mosier (introduced as a witness by the plaintiff) is to the effect that, just previous to the accident, his engine was standing, according to his best judgment, about 2,000 feet north of the Tuolumne street crossing;

that he was sitting on the right-hand side of the cab at the time; that, after he started the engine, and was going in the direction of and approaching said street, he was looking toward the crossing.    He proceeded: "I was keeping a close lookout upon the track in the direction in which the engine was moving to see that the crossing was clear.    My fireman was on the left-hand side of the engine, and at that time was ringing the bell. . . . I came down the Collis main line from the roundhouse.    It is the first track west of the main line, which would be the third line coming from the west. . . . In crossing the railroad from G street upon Tuolumne street I think a cart would cross the two tracks before reaching the track I was on. I should judge I was backing up about four or five miles an hour.    There were automatic brakes and reverse upon this engine.    I ought to stop it in five or six feet, or eight feet, anyway, at the rate I was then going.    I cannot say just when was the first time I saw the horse and cart of Mrs. Zipperlen; it was quite a distance when I saw her coming.    She was then coming down from G street and was traveling east.    In order to see her, I would have to look across where the fireman was sitting on that engine.    I could sit up there and look on both sides, as it had a low tender.    I could see the whole front all the time and the whole situation.    I could see the track back of the tender.    I would say I could see the track back of the tender as far as across this courtroom here.    I could see a horse or buggy crossing the track as far away as across this courtroom by looking over the tender.    I could look over the tender and could see Mrs. Zipperlen coming in the cart. There was no time after I first saw her that it would have been impossible for me to see her before the accident, and I watched her and I watched her during the whole time.    When I first saw her she was going east coming down Tuolumne street."

The witness Stoner, who was driving toward Tuolumne street and was some thirty or forty feet back of Mrs. Zipperlen when the latter started across the tracks, testified that "when she got to the crossing she looked up and down to see if there were any cars and saw a clear track and started to go across. The engine was then about fifty yards from the crossing on Tuolumne street and was standing.    I saw the fireman when it started to back down on the track.    The fireman was sitting

7 Cal. App.—14

in his seat looking east. I did not watch the engine continuously until it arrived at the crossing. The rear end of the tender was about six or eight feet from the buggy when I saw it next. I should judge the engine was going about three miles an hour. Mrs. Zipperlen did not stop traveling or check up her horse to see whether the track was clear, and did not stop at any time after until the accident. She could not have stopped without my observing it. There was no time while Mrs. Zipperlen was driving along upon that track that she crossed entirely over the track upon which the engine and tender were backing, prior to the accident. She could not have done that without my seeing her. I did not observe her horse backing into the engine, . . . I did not see the engine slack speed before the collision. . . . The fireman was not looking in Mrs. Zipperlen's direction, that I saw. He was not ringing the bell and no bell was rung. I am positive no bell was rung. I could see the engineer's head sticking up over the cab. I might if I looked, but I do not think it would have been possible for the engineer to sit on that side without my observing him. I have acted as a fireman on the railroad. At the time of the collision the cart had just come on the first rail; the horse's ears were about past the tender. I am sure of that. Just as the collision took place the engineer started the engine the other way."

Mrs. Zipperlen testified that she had been familiar with the crossing at Tuolumne street for about eight years, and that when she reached the crossing and before starting to pass over it, she "paused to see that the track was clear"; that she observed that the engine was standing on one of the tracks, about seventy-five or one hundred feet from the crossing, and then started across. "I was perhaps twelve feet, or something like that, from the track that the engine was standing on. When I saw the engine standing still I started to cross. I was traveling at a slow, little trot. As I started to cross the engine started to back up, and then the engine struck the cart. I tried to back, back her off, but of course the engine frightened the horse and I could not do anything with her. She was badly frightened. I was not driving with a whip, and had no whip in my hand, and I heard no bell ringing. When I first saw the engine I saw the fireman. He was then on the west side of the cab. I did not see the engineer. I think I could have seen the engineer if he had been in the cab and high enough

to have seen me over the tender. I do not think the fireman saw me. I observed the engine as it came on down. I did not notice the fireman looking in my direction as long as I looked. Of course, after the horse became unmanageable I had all I could do to watch her. I do not think at any time I crossed entirely over the crossing upon which the engine was backing. I did not see the engineer or the engineer's face at any time. I did not hear the whistle blow. I do not think the engine was coming back very fast. After the engine struck the cart and I was thrown out upon the ground, I was lying right along side of the engine, or along side of the track rather. I could not see exactly how far the engine was from me when I saw it moving toward me. Possibly it was the length of this room, maybe not quite so far. When the engine struck the cart the horse reared up to one side, toward the right. The tender did not strike me. When the engine struck the wheel it threw me out. I rather think I fell backward. The engine, tender and wheels just at the moment I struck the ground were beside me. I was lying pretty close to the track, as close as I could possibly be without being injured by the wheels. The engine then ran on ahead, and I think the engineer sent the fireman to get it. I first saw the engineer when he stooped to pick me up about a couple of minutes afterward.''

Mosier, the engineer, testifying for the defense, repeated that he saw "Mrs. Zipperlen at all times from the time she started to cross until she got across''; that he "could see the whole rig until I got as close as the width of this room to it, about thirty feet.'' He stated that Mrs. Zipperlen had crossed the track the engine was on, when her horse became frightened and began to "buck and back,'' and backed onto the track on which the engine was moving. He declared that when the engine was six or eight feet from the cart, and the moment the horse began backing toward the track the engine was on, he stopped the engine as soon as he could, "put on the brakes and reversed the engine.'' The horse kept on backing, he continued, until it struck the engine, causing Mrs. Zipperlen to be thrown to the ground.

E. F. Phillips testified for the defendant that he saw the engine backing down the track toward the crossing over which Mrs. Zipperlen attempted to pass. He said that "the best of my recollection is that the locomotive was backing down, without any stop whatever from the roundhouse, and I heard its

bell ringing as it was backing down. The locomotive came on down and when the engineer saw her crossing the tracks it slowed up very perceptibly. I cannot say now whether it made a full stop or not, but I think it did. I think it kept on coming very nearly to a stop. Then her horse crossed the track that the locomotive was approaching on and got the cart wheels, as far as I could see from where I was, between the rails of the track beyond the track that the locomotive was approaching on, then her horse got unmanageable. She had no whip to strike him with. She did all she could with the lines to urge him on, and instead of his going forward as she wished he would, he commenced backing and backed in a quarter circle until the wheel of the cart was struck by the *approaching* locomotive, with just enough force to upturn the cart onto the other wheel and threw her from the vehicle.''

The foregoing constitutes the substance of the testimony given on direct examination of the principal witnesses introduced by both sides. The cross-examination of the witnesses, particularly that of Mrs. Zipperlen, revealed some discrepancies and inconsistencies which were of a character to make them peculiarly a matter for the jury to settle to its own satisfaction. A written statement, obtained from Mrs. Zipperlen a few hours after the accident happened, by Dr. Maupin, the defendant's local surgeon, and to which statement the husband of Mrs. Zipperlen signed the name of his wife, contained a declaration that the horse she was driving was wholly to blame for the accident. This writing was shown to Mrs. Zipperlen and she was asked, on cross-examination, if she made the statement. Her reply was that, while she was able to recall that Dr. Maupin had called to interview her on the day of the accident, she had no recollection of making the declarations which the written statement indicated she had made. But, as before declared, whatever inconsistency or apparent inconsistency might have been developed in her testimony through her cross-examination, it was, after all, for the jury and not for this court to determine whether her evidence had been thus shaken or shown to be unworthy of belief.

It is, however, plain to be seen from the evidence, of which we think we have given a fair conspectus, that either of the two theories upon which the case was tried in the court below is supportable by the proofs. From the testimony of Stoner a strong inference may be drawn that neither the engineer nor

his fireman saw Mrs. Zipperlen at any time, and knew nothing of her presence upon the crossing until the engine had collided with the cart. The jury would have been warranted from the engineer's testimony and from the circumstance that the engine proceeded to move down the track toward the crossing after she started over the crossing, and from the probability that had the engineer seen Mrs. Zipperlen in the act of passing over the crossing when he claimed that he did, he would have stopped his engine long before he reached the crossing and remained at a standstill until she got beyond any possibility of danger, in adopting the view that the negligence of the defendant consisted in the failure of the engineer to look for the purpose of determining whether the crossing was clear. Upon this theory, the following instruction, of which particular complaint is made, contains a clear declaration of the law, and was, therefore, proper and pertinent:

"If you believe from the evidence that plaintiff, Minnie Zipperlen, before undertaking to cross the railroad, at said time, exercised reasonable and ordinary care, and if you believe that after the engineer or fireman gave steam to their engine, the horse which the said Minnie Zipperlen was driving became frightened and stood upon the track on which the engine and tender were so moving toward her, and that plaintiff, Minnie Zipperlen, endeavored to urge the horse forward but could not do so, then the court charges you that the law imposed upon the servants of the defendant the duty of keeping a lookout and to observe and ascertain whether the crossing was clear, and if they failed to do so and the said Minnie Zipperlen was injured in consequence of their failure so to do, without any fault on her part, your verdict should be for the plaintiff, and you should assess such damages as you may deem just under all the circumstances, not exceeding the amount prayed for."

There is nothing in the case of *Bennichsen* v. *Market Street Ry. Co.*, 149 Cal. 18, [84 Pac. 420], in conflict with the views herein expressed. The instruction given to the jury in that case was upon the assumption that there was evidence showing that the motorman saw the plaintiff in a situation of danger, and declared that she was entitled to recover "if the defendant's employees could have avoided the injury by the exercise of ordinary care." The supreme court reversed the case because there was no evidence disclosed by the record

"that the motorman 'had an opportunity' to avoid injuring the plaintiff, or that he discovered her in a perilous situation."

If the record in that case had contained evidence justifying it, the instruction would not, of course, have been subject to criticism.

There is no claim that the instruction challenged here does not contain a correct statement of the law, and if, as we have suggested is the case, there is evidence to which it was applicable, then no valid objection can be urged against it.

Upon the theory of the "last clear opportunity"—that is, that the engineer saw and realized Mrs. Zipperlen's perilous situation and had ample opportunity to have avoided the accident by the exercise of reasonable caution and care—the evidence presents, we think, a substantial conflict, so that with the verdict, even if we could say that that was the theory adopted by the jury, we are powerless to interfere. The engineer, we have seen, testified that he saw Mrs. Zipperlen all the time, from the moment she started to cross the tracks; that she had passed over the track over which the engine was backing just before the engine reached the crossing. The latter statement was designed to furnish the inference that the accident would not have occurred but for the fact that the horse became frightened and unmanageable and backed upon the track in use by the engine, and backed into the engine, thereby causing the accident. But Stoner says that "there was no time while Mrs. Zipperlen was driving along upon that track that she crossed entirely over the track upon which the engine and tender were backing, prior to the accident." From this testimony it was within the province of the jury to conclude that Mrs. Zipperlen had not crossed over the track occupied by the engine and from all the circumstances find that the engineer knew such to be the fact. We are not concerned, it is true, with the reasoning of the jury upon the evidence by which it reached its verdict, but we may call attention to the testimony for the purpose of illustrating how it might have reached its conclusion and have been justified under the evidence in so doing. We think the evidence is sufficient to support the verdict and judgment.

It is claimed that the court erred in permitting the plaintiffs to introduce evidence for the purpose of showing that one of their own witnesses had, prior to the trial, made a

statement with reference to the accident inconsistent with his testimony at the trial. The witness, Mosier, having been called as a witness by the plaintiffs, testified to the facts to which we have already adverted with some particularity, and was then asked if he did not, addressing the husband of Mrs. Zipperlen, on the evening of the day of the accident, and alluding to the accident, say: "Ben, don't blame me for that. I was not to blame. I didn't see that horse until its ears projected past the end of the tender." To this question he replied in the negative. In rebuttal, and over the objection of the defendant, Bernhard Zipperlen was allowed to testify that Mosier made the statement embodied in the question. The court below, as well as counsel for respondents, appear to have assumed that the testimony was admissible for the purpose of impeachment; but we are of the opinion that, while its effect may practically be the same as if offered for impeachment, the only reason for which such testimony may be given is merely to explain the manifestly awkward position in which a party has been placed by reason of statements made by a witness, produced by himself, contrary to what he expected to prove by said witness and which are calculated to operate against the interests of his cause. It must be conceded that the rule authorizing the contradiction of one's own witness is, in its application, like the rule as to impeachment, attended with more or less danger of producing injustice, and, therefore, should never be invoked or allowed to be exercised by the court except where the exigencies of the situation and the circumstances of the alleged betrayal clearly warrant it. When enforced on appropriate occasions in a proper way, it undoubtedly produces a wholesome and just result.

The authority by which a party in this state is allowed to contradict his own witness, or show that he has made, at other times, statements "inconsistent with his present testimony," is found in section 2049 of the Code of Civil Procedure. That section also provides that "the party producing a witness is not allowed to impeach his credit by evidence of bad character." And, as seen, we think that the section was not intended as authority for the *impeachment* by any means of one's own witness, in the true legal sense of that term. The reference in that section to section 2052 of the same code merely means, we think, that before being permitted to prove

that his witness has made previous inconsistent statements, the party must lay the foundation as provided by the last-mentioned section—that is, must give the witness a chance to refresh his memory by calling his attention to the "circumstances of times, places and persons present," when and before whom such alleged inconsistent statement is claimed to have been made.

There are, however, certain qualifications to the rule established by section 2049, *supra,* and which it is indispensably necessary should be strictly observed, lest some other important rule of evidence be violated. First, the witness must give testimony damaging to the party producing him. Secondly, it must appear that the party by whom the witness has been produced has been misled and taken by surprise, and that he had reason to believe that the witness would give testimony favorably to his side. A party producing a witness virtually stands as an indorser of the character of such witness, and by the act of calling him to testify in his behalf in effect declares to the court and jury that the testimony of said witness will strengthen and support his contention; so, when the witness gives evidence which tends to destroy rather than build up the cause of the party who has presented him to the court and jury as a person possessing information valuable and material to his side of the controversy, the law steps in and says that no litigant should thus be placed at the mercy of such treachery, and authorizes the party to explain why he called him as a witness and thereby acquit himself of the otherwise disadvantageous imputation of contributing toward making out a case against himself. But a party, under the guise of the rule in question, will not be suffered to present to the jury mere hearsay declarations— declarations admissible neither under the rule of *res gestae* nor as having been made in the presence and hearing of the party against whom they are offered. The statement, the admission of which under the indicated circumstances is here claimed to have been prejudicially erroneous, could not, it is obvious, have gone into the record either as part of the *res gestae* or as a declaration in the presence and hearing of the opposite party. If it was not admissible for the purpose of "contradicting the witness," or of showing that he at another time made statements "inconsistent with his present testimony," to the end that the party might explain why he in-

troduced him as a witness, then it was incompetent for any purpose, because, if admitted, though a mere naked hearsay declaration, it would erroneously go before the jury as independent evidence.

We are aware that some early cases were disposed to hold that such testimony was admissible under no circumstances. We have not taken the trouble to ascertain whether, at the time of the filing of the opinions to which we refer, section 2049 of the Code of Civil Procedure, as it now reads, was a part of our law of evidence; but we would be unable to reconcile the intimation in those cases with the language of the section as it now exists. There is no reason upon principle why a party should not be allowed to contradict his own witness if the latter has betrayed such party and by his unexpected testimony placed the party producing and standing sponsor for him in a false light before the court or jury. There is every reason in principle why such a practice should be upheld, where it is clear that it has not been abused. Moreover, the legislature has recognized the soundness of the principle.

The questions, then, determinative of the admissibility of the testimony here are: Did the witness give testimony adversely to the plaintiffs, for whom he was called to testify? If so, does it reasonably appear that the plaintiffs were taken by surprise because of the nature of the testimony given by said witness?

The plaintiffs undoubtedly sought to prove by Mosier that he did not see Mrs. Zipperlen until the accident occurred, and that, therefore, he was not, when moving his engine toward the crossing, exercising the care and caution with which he was charged by the law. But the engineer declared he did see her all the time, the effect of such declaration being that he was approaching the crossing in a careful, prudent and cautious manner. It was then that counsel for plaintiffs asked him if he did not state to Bernhard Zipperlen that he did not see his wife until about the time the collision occurred. We doubt not that the sole theory of the plaintiffs, up to the time Mosier was called by them and testified as their witness, was that the engineer's negligence, if there was negligence, was due to his total failure to look down the track toward the crossing to learn whether it was clear or being used by some traveler. In this view and upon this theory his testimony was certainly adverse and damaging to

plaintiffs. But, assuming that the evidence shows the other theory to be the correct one—the theory for which the testimony of Mosier given as a witness for plaintiffs was undoubtedly the inspiration—that is, the last clear opportunity theory—and that the jury adopted that view, then the testimony of Bernhard Zipperlen rebutting the statements of Mosier was, it is manifest, altogether immaterial and harmless, for if the jury found in accordance with the last suggested theory it no doubt based its verdict largely upon the evidence of the engineer himself, said evidence tending more to establish that theory than the other.

The solution of the second question determinative of the competency of the testimony *appears* to be fraught with greater difficulty than the first, yet it seems to us, as the first part of this sentence implies, that the difficulty is more apparent than real. Were the plaintiffs surprised by the character of the testimony given by Mosier? There is nothing in the record showing that the court received *evidence* upon which to found its determination of this preliminary question. The question is one addressed solely to the judgment of the court, for it is a question of law with which the jury is not concerned. The record does show, however, that Mr. Cartwright, one of the attorneys for the plaintiffs, stated to the court, when objection was made to questions to Mosier for the purpose of laying the foundation for Bernhard's testimony, that the statement of Mosier "is entirely different from what we had expected," and when it was sought to show the alleged contradictory statements through said Bernhard, Mr. Van Meter, for the plaintiffs, declared to the court that Mosier's testimony "was different from that which the plaintiffs' attorneys understood that it would be," and requested the court to instruct the jury that "this question is asked solely for the purpose of impeaching" Mosier, and "not for the purpose of showing any affirmative fact other than the impeachment." The statute does not expressly point out the procedure to be adopted in such a case, nor has our attention been directed to any appellate court opinion in which any suggestion as to the proper procedure is ventured. It is obviously true that the court must be put in possession of facts from which it can say whether testimony contradicting one's own witness may be introduced, and we think there can be no doubt that the better practice would be to present evi-

dence through sworn witnesses upon the question. But in any event, much should be left to the sound discretion of the trial court. In the case at bar the course suggested was not pursued, the court evidently being satisfied with the unsworn statements of counsel that Mosier's testimony was "different from that which the plaintiffs' attorneys understood that it would be." We cannot say that the court below abused its discretion in allowing the evidence upon the statements of counsel. To assume that counsel were not acting in good faith with the court—that they knew that Mosier would testify as he did, and that they called him as a witness for no other purpose than to furnish a mere pretext for introducing evidence otherwise absolutely incompetent and inadmissible—would be tantamount to accusing counsel of resorting to the veriest pettifoggery. The judge of the court below is presumably well acquainted with plaintiffs' counsel, and without apparent hesitation exercised for the court a discretion favorable to their contention, and, as before suggested, we cannot say abused it.

We have reviewed the record before us *in extenso* because the case, like nearly all cases of personal injury, presents important questions. The state of the evidence is such (as we believe and have held) as to make it a case peculiarly for the jury, with whose function under the law there would be, we think, unwarranted interference were we to hold that the evidence is insufficient to justify its conclusion. There is evidence, as will be perceived by an examination of the record, showing that Mrs. Zipperlen, before proceeding to start over the crossing, stopped for an instant and looked to see if the track was clear, and that when she started to cross the tracks the engine was at a standstill. If the engineer, as he declared was the fact, saw her all the time, there appears no reason why he should not have exercised a greater degree of care and caution than the evidence discloses. If he did not see her until she was in a position of danger, and then had the opportunity of avoiding the accident, as the jury was justified in finding, he was at fault in not doing so, even if it should be admitted that she herself was primarily negligent.

There are other assignments of alleged error which are, we think, undeserving of special or extended notice.

The question addressed to the fireman by the engineer, in the presence of Mrs. Zipperlen, immediately following the

accident, "Why didn't you tell me to stop?" was asked so near the time the accident occurred as to make it a part of the transaction, and therefore admissible under the rule of *res gestae.* The mere fact that the accident preceded the question does not necessarily take it out of that rule. (*Heckle* v. *Southern Pacific Co.,* 123 Cal. 442, [56 Pac. 56]—the opinion by McFarland, J., giving a clear exposition of the rule.)

We are unable to discover any just reason for disturbing the judgment, and, for the reasons herein discussed, it is affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 20, 1908.