[Crim. No. 17295. In Bank. July 31, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
BENJAMIN LAWRENCE NUDD, Defendant and Appellant.

## COUNSEL

Robert V. Fullerton, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Daniel J. Kremer, Mark L. Christiansen and Harley D. Mayfield, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

CLARK, J.—Defendant appeals from judgment entered on jury verdicts convicting him of two violations of Penal Code section 4573.6: Possession of narcotics (Demerol) and narcotics paraphernalia (a hypodermic syringe) by a state prison inmate. We affirm the judgment.

While patrolling a cell block, a state correctional officer noticed defendant had blacked out his window, but was sitting awake beside a table at the rear of the cell, his back to the door and his right hand clenched. A knotted strip of rag and small vial labeled "Demerol" lay on the table. Asked what he was doing, defendant answered "Nothing." Told to hand over whatever he was holding, defendant shook his head "no," and, his hand still closed, pushed the officer away. The officer shoved defendant into the corridor, but slipped. Defendant clambered over him back into the cell, kicked the lid off the toilet, and making a throwing motion, flushed it repeatedly.

The struggle ended, the officer found a makeshift syringe on the corridor floor a foot from defendant's cell door. It had not been there previously, nor had anyone been in the corridor in the interim. The syringe contained 12½ to 25 milligrams of Demerol, a synthetic narcotic. The vial had a capacity of approximately 100 milligrams, sufficient to produce some euphoric effect had it been full of Demerol. However, when found on the cell

floor after the struggle it was broken, insufficient fluid remaining for analysis.

On direct examination, defendant testified that the officer grabbed him for no apparent reason, and that he had nothing in his hand, did not struggle toward the toilet, throw anything into it, or flush it. On cross-examination, defendant was asked if he had not admitted to correctional officers that he had thrown contraband into the toilet. The defense objected.

At the *in camera* hearing to determine the admissibility of defendant's extrajudicial statement, and again in open court when his objections were overruled, the officer and his supervising lieutenant testified as follows: When the lieutenant advised him of his *Miranda*[1] rights and asked him whether he wanted to talk, defendant responded by asking if he would be charged with a felony. Informed he probably would be, defendant said, "Well, then, I don't have anything to say." The lieutenant then asked defendant "off the record" why he had fought with the officer and defendant replied he liked the officer but had to get rid of the "speed."

A statement inadmissible as substantive evidence for violating *Miranda* may nevertheless be used to impeach a defendant's credibility if the statement is otherwise trustworthy. (*Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643].) However, defendant's statement, unlike Mr. Harris', was made after he had been advised of his *Miranda* rights and had asserted his privilege against self-incrimination. Holding his statement admissible under *Harris,* defendant contends, will encourage *Miranda* violations and discourage other defendants from testifying for fear they will be convicted by jury misuse of the statements as substantive evidence despite instructions limiting their use to impeachment.

Critics predicted *Harris* itself would have the same effects.[2] But the

[1]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[2]Note, *Constitutional Law—Evidence—Statements Inadmissible Against a Defendant as Substantive Evidence May Be Used to Impeach Credibility of Defendant's Trial Testimony* (1970) 39 Geo.Wash.L.Rev. 1241, 1246-1248; Note, *Criminal Procedure — Self Incrimination — Statement Admissible to Impeach Defendant Even Though Miranda Warnings Were Not Given* (1971) 40 Fordham L.Rev. 394, 399-400; Note, *Evidence—Criminal Law—"Trustworthy" Self-Incriminating Evidence Not Otherwise Admissible Under Miranda v. Arizona Is Admissible to Impeach an Accused's Trial Testimony* (1971) 49 Texas L.Rev. 1119, 1126-1127; Note, *Evidence—Statements Obtained in Violation of Miranda Guidelines May be Used to Impeach Testifying Defendant's Credibility* (1971) 24 Vand.L.Rev. 843, 848-850; Note, *The Supreme Court, 1970 Term* (1972) 85 Harv.L.Rev. 3, 51-52.

*Harris* court, anticipating the criticism and recognizing the conflicting values at stake, struck the balance in favor of seeking the truth. "The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief. [¶] Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. . . . [¶] The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (401 U.S. at pp. 225-226 [28 L.Ed.2d at pp. 4-5]; citations and fn. omitted.)

We adopt the *Harris* rationale. Moreover, this case is in greater harmony with *Miranda* than *Harris* itself, because defendant—unlike Mr. Harris—was made aware of his *Miranda* rights.

■ Invoking the principle that an accused may not be impeached by an "involuntary" statement (*People* v. *Underwood* (1964) 61 Cal.2d 113, 120 [37 Cal.Rptr. 313, 389 P.2d 937]), defendant next contends his statement was necessarily involuntary. His contention finds apparent support in *Miranda,* but the support is illusory. "[A]ny statement taken after the person invokes his privilege [against self-incrimination] cannot be other than the product of compulsion, subtle or otherwise." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 474 [16 L.Ed.2d 694, 723].) The sense in which a statement taken after invocation of the privilege is deemed "involuntary" must be distinguished from what is elsewhere in *Miranda* called the "traditional" sense of the term. (See *Miranda* v. *Arizona, supra,* 384 U.S. at p. 457 [16 L.Ed.2d at pp. 713-714].)

A statement is involuntary in the traditional sense if it is the product of physical or psychological coercion. (*Rogers* v. *Richmond* (1961) 365 U.S. 534, 544 [5 L.Ed.2d 760, 768, 81 S.Ct. 735]; *In re Cameron* (1968) 68 Cal.2d 487, 498 [67 Cal.Rptr. 529, 439 P.2d 623]; *People* v. *Lopez* (1963) 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16].) "A principal objective of [*Miranda*] was to establish safeguards that would liberate courts insofar as possible from the difficult and troublesome necessity of

adjudicating in each case whether coercive influences, psychological or physical, had been employed to secure confessions or admissions." (*People* v. *Fioritto* (1968) 68 Cal.2d 714, 717 [68 Cal.Rptr. 817, 441 P.2d 625].)

 Thus, insofar as the prosecution's case in chief is concerned, *Miranda* has relieved courts of the necessity of determining whether a statement taken in violation of its safeguards may also have been the product of coercion. However, the determination of voluntariness is still necessary under *Harris* when the statement is offered for impeachment. As the statement there held inadmissible was coerced, *People* v. *Underwood, supra,* does not govern this case.[3]

Defendant contends his statement was involuntary in the traditional sense, as well, because it was made in reliance on the lieutenant's invitation to speak "off the record" and in response to coercion implicit in his power to affect defendant's conditions of confinement and chances of parole. However, when testifying at the *in camera* hearing on the voluntariness of his statement, defendant did not even suggest it was the product of such considerations. Instead, he simply denied making the statement. In fact, although his testimony on the point is not free from ambiguity, it appears defendant did not even realize the lieutenant was offering him the opportunity to speak confidentially.[4]

Assuming arguendo that his statement was admissible under *Harris* to impeach his credibility, defendant contends the trial court committed prejudicial error by failing to instruct the jury on its own motion that consideration of the statement must be limited to that issue. Granted, even though not requested to do so, the trial court must instruct the jury on the general principles of law raised by the evidence. (*People* v. *Perry* (1972) 7 Cal.3d 756, 788 [103 Cal.Rptr. 161, 499 P.2d 129]; *People* v. *Hood* (1969) 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370].) But absent request by a party, there is no duty to give an instruction limiting the purpose for which evidence may be considered. (See Evid. Code, § 355; *People* v. *Cantrell* (1973) 8 Cal.3d 672, 683 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Perry, supra,* 7 Cal.3d at pp. 787-788; *People* v. *White* (1958) 50 Cal.2d 428, 430 [325 P.2d 985]; *People* v. *Simms* (1970) 10 Cal.App. 3d 299, 310-311 [89 Cal.Rptr. 1].)

---

[3]The defendant there testified he made the statement because he was physically exhausted from lack of sleep after police repeatedly awakened him, he had a piercing headache caused by sleep loss and physical abuse from the victim's family, and an officer said he personally would see that defendant was escorted to the gas chamber. (*People* v. *Underwood* (1964) 61 Cal.2d 113, 119-121 [37 Cal.Rptr. 313, 389 P.2d 937].)

[4]"Q. Do you recall [the officer] saying something to you about talking off the record? [¶] A. No. sir. [¶] Q. Did you talk to him off the record? [¶] A. Yes, I did. We talked afterwards; I don't know if it was off the record but we talked."

■ Defendant accuses the prosecutor of misconduct on the ground he did not offer his statement until rebuttal, improperly suppressing it prior thereto. However, the statement could not properly have been introduced in the prosecution's case in chief because it was clearly inadmissible under *Miranda* and *Fioritto*. Moreover, there was no showing the prosecutor had knowledge of it before defendant testified, prompting the lieutenant to reveal the statement he had until then kept in confidence.[5]

Finally, contrary to defendant's contention, the other evidence was sufficient to support the convictions. (See *People* v. *White* (1969) 71 Cal.2d 80, 82 [75 Cal.Rptr. 208, 450 P.2d 600]; *People* v. *Groom* (1964) 60 Cal.2d 694, 696 [36 Cal.Rptr. 327, 388 P.2d 359]; *People* v. *Redrick* (1961) 55 Cal.2d 282, 285 [10 Cal.Rptr. 823, 359 P.2d 255].)

Judgment affirmed

Wright, C. J., McComb, J., and Burke, J., concurred.

**MOSK, J.**—I dissent.

California has adhered to the exclusionary rule as a vital element of criminal law and procedure for nearly two decades. (*People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].) This court's adoption of the rule not only was not compelled by United States Supreme Court opinions, it *preceded* the federal exclusionary rule as applied to the states by six years. (*Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933].) Thus the California exclusionary rule was and is of wholly independent status, not subject to the shifting sands of federal court interpretations of *Mapp* and its progeny.

Nevertheless, in a headlong rush to jettison on policy grounds challenged phases of the exclusionary rule,[1] the majority seize upon *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], as a convenient tool to use in abandoning well-established principles that have guided courts, prosecutors and defense counsel for many years.[2]

---

[5]At the *in camera* hearing, the correctional officers testified they had not previously recorded or reported defendant's statement and would have continued to keep it in confidence had he not perjured himself.

[1]See, e.g., the dissent in *Dyas* v. *Superior Court* (1974) 11 Cal.3d 628 [114 Cal. Rptr. 114, 522 P.2d 674], which relies upon the lone dissent of Burger, C. J., in *Bivens* v. *Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388, 411 [29 L.Ed.2d 619, 635, 91 S.Ct. 1999].

[2]Academic reaction to *Harris* has been strongly critical. (See, e.g., the comment by Professors Dershowitz and Ely in (1971) 80 Yale L.J. 1198.)

## I

If stare decisis has not totally lost its relevance, the successive cases of William R. Lilliock should be controlling.

In *People* v. *Lilliock* (1965) 62 Cal.2d 618 [43 Cal.Rptr. 699, 401 P.2d 4], this court held that statements obtained from the defendant should have been excluded because of police failure to advise him, prior to interrogation, of his constitutional rights and to permit him to remain silent in reliance thereon. The conviction was reversed. On retrial the defendant took the stand and the prosecution used *the same invalid statements for purposes of impeachment;* this, held the Court of Appeal, constituted prejudicial error. (*People* v. *Lilliock* (1968) 265 Cal.App.2d 419, 426 [71 Cal.Rptr. 434].)

*Lilliock* was consistent with California cases which have held, both in and out of an exclusionary rule context, that inadmissible evidence cannot be used for impeachment purposes. For example, hearsay was held inadmissible to impeach as long ago as the turn of the century. (*People* v. *Conkling* (1896) 111 Cal. 616, 623 [44 P. 314]; *Zipperlen* v. *Southern Pac. Co.* (1908) 7 Cal.App. 206, 216 [93 P. 1049].) And as recently as last year, *after* the decision in *Harris,* evidence obtained in violation of Fifth Amendment rights, when used for impeachment, caused a reversal in *People* v. *Bais* (1973) 31 Cal.App.3d 663 [107 Cal.Rptr. 519], and this court unanimously denied a hearing. (Also see *People* v. *Rice* (1971) 16 Cal.App.3d 337 [94 Cal.Rptr. 4], another post-*Harris* case in which this court unanimously denied a hearing.)

The majority concede that involuntary statements cannot be used for impeachment purposes (*People* v. *Underwood* (1964) 61 Cal.2d 113, 120 [37 Cal.Rptr. 313, 389 P.2d 937]), but they seem to say that there are varying degrees of involuntariness. That may be true, hypothetically. But to evaluate the nature and effect of compulsion on an ad hoc basis seems to be the kind of metaphysical exercise the Supreme Court sought to avoid by establishing its precise rule in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

Under the strange new rule adopted by the majority, a statement taken in violation of *Miranda* is to be excluded because it is deemed to be per se coercive, but despite its coercive character it may be used for impeachment purposes after the court pauses, not merely mid-trial but mid-examination, to pass on its involuntariness. Not only is this a time-consuming and im-

practical procedure, but the underlying concept that a coercive statement may at the same time be voluntary is a contradiction the reconciliation of which totally eludes me.

The majority theory is directly contrary to this court's decision in *People v. Fioritto* (1968) 68 Cal.2d 714, 717 [68 Cal.Rptr. 817, 441 P.2d 625], in which we said: "A principal objective of [*Miranda*] was to establish safeguards that would liberate courts insofar as possible from the difficult and troublesome necessity of adjudicating in each case whether coercive influences, psychological or physical, had been employed to secure admissions or confessions." Once a suspect has exercised his rights pursuant to *Miranda*, the "form of the renewed queries, however subtle or gentle, cannot be considered in determining whether there has been a violation of the stern principles prescribed by the Supreme Court in *Miranda*." (*Id.* at p. 720.)

## II

The theory that the use of an invalid statement for impeachment purposes exposes perjury by a defendant is based on the faulty premise that the coerced statement is likely to be true. Given the basically coercive nature of custodial interrogation, a prior inconsistent statement obtained without warning a suspect of his rights is equally likely to be false. Introduction of such a statement, far from aiding the court's objective of preventing perjury, may actually serve to hobble the search for truth. (Note (1971) 85 Harv.L.Rev. 44, 48.)[3]

---

[3]How *Harris* can be misused by law enforcement is hypothesized by Professors Dershowitz and Ely in 80 Yale Law Journal, *supra,* at pages 1220-1221: "That this is precisely the situation with regard to the impeachment use of statements secured in violation of *Miranda* is easily demonstrated. Consider a situation where the police have lawfully arrested a defendant and have obtained enough admissible evidence to make a *prima facie* case. But their case is not strong, and so an effort is made to elicit a statement by the defendant that would bolster it. The defendant evidences some willingness to talk but when he is asked whether he would like to speak to a lawyer first, he shrugs his shoulders and says, 'Why not?' The police know that under *Miranda* he must be given a lawyer before any further questioning; they also realize that as soon as a lawyer arrives there is little chance that any further questioning will be permitted. Under the *Harris* rule, what possible incentive would the police have to comply with *Miranda* by either terminating the interrogation or securing a lawyer? Is it not clear that any reasonable policeman, calculating the advantages and disadvantages of securing a lawyer for the defendant before any further questioning, would always conclude that he should proceed with the questioning in violation of *Miranda?* If the defendant then makes a statement, the net effect of the violation will be that the police will have in their possession an item of evidence they would not have been able to secure had they complied with *Miranda.* And this evidence might very well make the difference between winning and losing the ultimate case. It might well persuade a defendant who would otherwise take the witness stand to 'waive' his right

The Oregon Supreme Court reached this conclusion in *State* v. *Brewton* (1967) 247 Ore. 241 [422 P.2d 581, 582-583], cert. den., 387 U.S. 943 [18 L.Ed.2d 1328, 87 S.Ct. 2074], in which it analyzed the problem in this manner: "While an argument can be made that 'voluntary' unconstitutional confessions can be distinguished from 'involuntary' unconstitutional confessions, solely for the purposes of impeachment, this dichotomy does not appeal to us as constitutionally meaningful.

" . . . . . . . . . . . . . . . . .. .

"[The United States Supreme Court has acted] . . . upon the assumption that the exclusionary rule is a necessary procedural device to implement the substantive rights written into the Fourth, Fifth, and Sixth Amendments. This court, accordingly, has adopted the assumption that without the procedural aid of the exclusionary rule those substantive rights would be empty promises instead of constitutional guarantees. . . .

"If we should today adopt a restrictive application of the exclusionary rule, the result could be a major step backward. This court would in effect be saying to the overzealous that police officers will be free in the future to interrogate suspects secretly, at arms length, without counsel, and without advice, so long as they use means consistent with threat-or-promise voluntariness, and so long as they understand that they may file the information only for use to keep the defendant honest. Thus the police could, at their option, take a calculated risk: By giving up the possibility of using the suspect's statements in the state's case, they could obtain by unconstitutional means and store away evidence to use if the defendant should elect upon trial to take the stand. As commendable as it may be to prevent perjury, the price of such prevention could be to keep defendants off the stand entirely. In some cases, the temptation to silence a suspect of dubious probity might very well outweigh the desire to conduct a constitutionally valid interrogation. We have concluded that to introduce such a rule could undo much of the recent progress that has been made in upgrading police methods to preserve the rights guaranteed under the Fifth and Sixth Amendments, and would be inconsistent with the trend of our recent decisions."

### III

This kind of erosion of the exclusionary rule is not deemed necessary by thoughtful professional law enforcement leaders. In an article in 33 Fed-

to do so. (And it is widely acknowledged that a defendant—at least one without a criminal record—who takes the witness stand and tells his story has a considerably better chance of acquittal than one who stands mute.) Or if the defendant does take the stand, his admission could be used by the Government, ostensibly to impeach him, but realistically to shore up its otherwise weak case." (Fns. omitted.)

eral Bar Journal (1974) 103, Clarence M. Kelley, Director of the Federal Bureau of Investigation, reviewed the historical background of the exclusionary rule from 1914 (*Weeks* v. *United States* (1914) 232 U.S. 383 [58 L.Ed. 652, 34 S.Ct. 341]) to 1961 (*Mapp*). He declared: "This example of development in the criminal procedural law also evidences the constantly competing interests that are found in the law enforcement function. On the one hand there is the public demand that crime be repressed, and on the other the need to ensure the individual's right to be free of the unreasonable restrictions of government. Here, in this area of criminal procedure the decision has been made by the courts. The law will not allow the government to base a successful prosecution on the illegal activities of a police officer.

"· · · · · · · · · · · · · · · · ·

"The fact that a man, guilty in fact, may escape justice is not the fault of the judiciary. The courts, no matter how reluctantly, will not permit the evidence into trial, not because they wish to allow the guilty to go free or that the evidence does not have efficacy in establishing the guilt of an accused, but because they will not countenance unconstitutional activities by law enforcement agencies.

"And what are the proper responses of law enforcement to the strict rules that punish their 'blunders' so severely? Surely, it cannot be the claims that present-day rules of evidence make its job more difficult or demanding. These are accidentals. Instead, it must be a resolve to accept the rules as defined by the courts and to prepare to meet the challenges they present. This requires a knowledgeable, well-trained officer. He must not only learn the increasing number of technical rules developed by the law, but he must be so skilled in their application that when pressed by on-the-street, unprecedented occurrences, he can respond correctly. This is no simple task. It calls for a continuing training program for law enforcement. It is so difficult because it is so dynamic. It is not enough to learn the language of the rules. The real importance is not to be found in the language, but in the policies behind the rules, their history, and their purposes.

"It may be said that the general aim of FBI Training is to teach both our Special Agents and State and local law enforcement officers attending our schools how to enforce the criminal law in a manner that is not only effective, but also fair, enlightened, and scrupulously lawful.

"This general aim can be considered to be the strong thread pulling together the work of the several academic departments of the FBI Academy

at Quantico, Virginia. Needless to say, each department has an individual responsibility of its own in reaching this general goal. The particular responsibility of the Law Department is to insure that the criminal law is enforced in a lawful way.

"Experience shows that one of the most critical problems confronting American law enforcement is this—when a crime is committed, officers are so preoccupied with the question of who is guilty that they zealously plunge ahead to find the answer and in doing so are often forgetful of the narrow limits the law sets to its finding. When they go beyond these lawful limits, they may taint highly probative evidence by violations, technical or flagrant, of the exclusionary rules based on the Fourth, Fifth, and Sixth Amendments to the Constitution; or they may lose important evidence by failure to keep in mind traditional evidentiary rules such as Hearsay, Best Evidence, and Authentication and Identification of documentary and real evidence. If they act in improper and unprofessional ways, the result is clear—relevant evidence is rendered worthless at trial, their effort is in vain, a man who may be guilty in fact escapes justice under the law, and the law is enforced in a lawless way.

"A major responsibility of legal training, therefore, is to try to temper the zeal of our students by the light of instruction and learning—to teach not only the letter of the law but also its spirit by explaining the history, principles, policies, and reasons which underlie the legal rules and prohibitions that come into play in the course of various police actions. It must accent the positive, stressing not so much what officers cannot do, but what they can do within the law. This positive approach is necessary . . .

" . . . . . . . . . . . . . .

"Another control which is effective and important in limiting the activities of any Special Agent is our own internal rules which are often even more restrictive than the current law on particular procedural matters. Our insistence on innovating internal rules in order to ensure the full constitutional rights of an accused has been a matter of tradition with the FBI. For example, the Supreme Court of the United States, in the case of *Miranda* v. *Arizona,* held that an accused in the custody of a law enforcement officer has the constitutional right to remain silent and the right to a lawyer prior to any questioning. In the opinion, the Court pointedly relied upon the fact that providing such rights was an existing and workable procedure with the FBI." (Fns. omitted.) (*Id.* at pp. 104-105, 110-111.)

Director Kelley concluded that the "FBI owes its existence to specific

legal authority; its actions are limited by law; and it believes its performance is properly the subject of legitimate scrutiny.

". . . . . . . . . . . . . . . .

·"For today's law enforcement officer, it is not enough that he be correct in most of his actions, or that he be cognizant of most of his responsibilities and their limitations. The consequences to the public well-being are too severe to permit it—a man guilty in fact escapes justice—the rights guaranteed in our Bill of Rights are violated.

"As the demands of the law have placed higher standards on the conduct of the law enforcement officer, the need has increased for the officer to be well-trained, and knowledgeable in legal matters. The aim of FBI training is to teach law enforcement personnel how to enforce the criminal law in a manner that is not only effective, but also fair, enlightened, and , scrupulously lawful." (*Id.* at pp. 109, 111.)

The FBI, which operates throughout the nation, has been able to function effectively without violating individual constitutional rights. So, too, have most state and local law enforcement agencies met their responsibilities lawfully in the two decades since *Cahan* became the rule in California.

## IV

, Even if we were to employ the new test created by the majority, the statement here used for impeachment could not be deemed voluntary. The Court of Appeal majority analyzed this issue thoroughly and in a thoughtful opinion written by Acting Presiding Justice Kerrigan, concurred in by Justice Tamura, concluded the statement was improperly induced and therefore involuntary. I adopt this part of Justice Kerrigan's opinion (fns. omitted):

Although the trial court's determination of voluntariness is entitled to great weight, and will not be lightly overturned on appeal, it is the appellate court's duty to re-examine the uncontradicted facts to determine independently whether or not the accused's extra-judicial statements were voluntarily obtained. (*People* v. *Sanchez, supra,* 70 Cal.2d 562, 571 [75 Cal.Rptr. 642, 451 P.2d 74]; *People* v. *Daniels* (1969) 1 Cal.App.3d 367, 374 [81 Cal.Rptr. 675].) The performance of this duty cannot be foreclosed by the finding of a court, or the verdict of a jury, or both. (*Payne* v. *Arkansas* (1958) 356 U.S. 560, 562 [2 L.Ed.2d 975, 978, 78 S.Ct. 844].)

The burden is on the prosecution to show that the statements were voluntarily given without previous inducement, intimidation or threat. (*People* v.

*Sanchez, supra,* 70 Cal.2d 562, 572.) The statements are inadmissible if they were made under "the slightest pressure" by the authorities (*People* v. *Berve* (1958) 51 Cal.2d 286, 291 [332 P.2d 971]), or if there was "compulsion or inducement of any sort" (*Haynes* v. *Washington* (1963) 373 U.S. 503, 513 [10 L.Ed.2d 513, 521, 83 S.Ct. 1336]), or if the police used "any direct or implied promises, however slight," or "any improper influence." (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 7 [12 L.Ed.2d 653, 659, 84 S.Ct. 1489].) Whether the statements were obtained by coercion or improper inducement can be determined only by an examination of the entire record and the totality of the circumstances. (*Haynes* v. *Washington, supra,* 373 U.S. 503, 513; *People* v. *Sanchez, supra,* 70 Cal.2d 562, 572; *People* v. *Daniels, supra,* 1 Cal.App.3d 367, 374.)

Under the "totality of the circumstances" test, defendant's statements must be held to be involuntary as a matter of law. Here, as in *Haynes,* there was no claim that the defendant was physically abused, deprived of food or rest, or subjected to prolonged periods of uninterrupted questioning. (See *Haynes* v. *Washington, supra,* 373 U.S. 503, 504, fn. 1 [10 L.Ed.2d 513, 516].) On the other hand, the uncontradicted evidence was that: (1) Defendant was an inmate in a state prison, being questioned by a senior officer of the custodial force with a probable felony charge facing him; (2) he had unequivocally asserted his right to remain silent; (3) he consistently denied possession of the paraphernalia recovered by Mr. Wenzel from the corridor floor; and (4) he was told that the conversation would be "off the record."

Of the listed circumstances, those that most influence our judgment are the first and last. Defendant's interrogator was a person who had tremendous power to influence, for better or for worse, his life in prison and his future by, for example, granting or withholding privileges, imposing light or arduous conditions of confinement, making favorable or unfavorable entries in official records, or by favorable or unfavorable recommendations to the parole board (defendant's scheduled parole date was only a few months after the incident). (See *Clutchette* v. *Procunier* (N.D.Cal. 1971) 328 F.Supp. 767, 777-778.)

The most reasonable interpretation of the term "off the record" is that defendant believed, and was expected to believe, that any remarks he chose to make would be kept in strict confidence and would not be used against him in court. In this respect, the case is similar to *People* v. *Johnson* (1969) 70 Cal.2d 469 [74 Cal.Rptr. 889, 450 P.2d 265], where a conviction was reversed because, among other things, of admission into evidence of damaging statements made by the accused to a district attorney's investi-

gator, who told him " 'this had to be a free and voluntary thing, that anything he said could be used against him, that he didn't have to say anything if he didn't wish, that the *evidence obtained was not admissible in court, but it was an investigative, lead, aid.*' " (Original italics.) (*Ibid.*, p. 474.)

In view of Keser's power over defendant, the invitation to talk off the record could reasonably be interpreted as an implied promise of more favorable treatment if he did talk. (See *People* v. *Barric* (1874) 49 Cal. 342, 345 (sheriff told prisoner, " 'It will be better for you to make a full disclosure' ") and other cases cited in Witkin, Cal. Evidence (2d ed. 1966) § 482, p. 444.) Any such inducement renders a confession inadmissible. (*People* v. *Carr* (1972) 8 Cal.3d 287, 296 [104 Cal.Rptr. 705, 502 P.2d 513].)

We do not discuss the cases cited by both sides on the subject of statements obtained by trickery or deception because the facts of the present case do not show deliberate fraud on the part of the questioning officer.

The suggestion by the prosecution that Lieutenant Keser's interrogation "off the record" was designed not to elicit incriminating responses but only to get to the bottom of the physical encounter is disingenuous. The physical encounter itself, if Officer Wenzel's version be accepted, would constitute an offense. (Pen. Code, § 4501.5.)

The Attorney General asserts that the legitimate and compelling interest of the prison officials in determining the reasons for physical resistance by an inmate outweighed defendant's Fifth Amendment right against self-incrimination, citing *People* v. *Miller* (1969) 71 Cal.2d 459 [78 Cal.Rptr. 449, 455 P.2d 377], cert. den., 406 U.S. 971 [32 L.Ed.2d 672, 92 S.Ct. 2417] and *People* v. *Paton* (1967) 255 Cal.App.2d 347 [62 Cal.Rptr. 865]. These cases involved the omission of *Miranda* warnings before noncustodial interrogation which was directed in each case not toward incriminating responses but toward obtaining information needed immediately to save human life. They are not authority for the Attorney General's untenable position.

On the other hand, nothing in the record compels an inference that Lieutenant Keser had bad motives or did anything other than what he thought his duty required. We may infer from his testimony that at the time of the off-the-record conversation with defendant, he did not in fact intend to use it against the defendant in court.

Nevertheless, whatever the motives behind such interrogations, we condemn the practice of "off-the-record" conversations with inmates ac-

cused of criminal offenses. Unless the prosecution can meet its heavy burden of proving that any such conversation was initiated by the inmate himself, either of his own free will or on advice of counsel, any statements elicited in the course of such conversations must be deemed involuntary and inadmissible in evidence for any purpose in a trial on the merits of a declarant accused of a criminal offense.

We hold that, in the circumstances of this case, the use of his extrajudicial statements to impeach or rebut defendant's testimony denied him his constitutional rights against self-incrimination and to due process of law (U.S. Const., Amends. V and XIV; Cal. Const., art. I, § 13), rights which he did not forfeit when he forfeited his liberty by commission of the crime for which he was imprisoned. (See *Jackson* v. *Bishop* (8th Cir. 1968) 404 F.2d 571, 576; *Clutchette* v. *Procunier, supra,* 328 F.Supp. 767.)

The introduction into evidence of an involuntary confession compels reversal regardless of other evidence of guilt. (*In re Cameron* (1968) 68 Cal.2d 487, 503 [67 Cal.Rptr. 529, 439 P.2d 633]; *People* v. *Matteson* (1964) 61 Cal.2d 466, 469 [39 Cal.Rptr. 1, 393 P.2d 161]; *Haynes* v. *Washington, supra,* 373 U.S. 503, 518 [10 L.Ed.2d 513, 523-524].) [End of quote from Justice Kerrigan's opinion.]

V

For the foregoing reasons I conclude, as did the Court of Appeal, that the judgment should be reversed.

Tobriner, J., and Sullivan, J., concurred.